# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

No. 25-2042

---

**SIERRA CLUB,**

*Petitioner*,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

*Respondent*.

---

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

---

## PROOF OPENING BRIEF OF PETITIONERS NATIONAL
## PARKS CONSERVATION ASSOCIATION AND SIERRA CLUB

---

Charles McPhedran
Pa. Bar ID No. 60123
Earthjustice
1617 John F. Kennedy Blvd. Suite
2020
Philadelphia, PA 19103
(215) 717-4521
cmcphedran@earthjustice.org

*Counsel for Petitioners National
Parks Conservation Association and
Sierra Club*

Joshua D. Smith
Ore. Bar ID No. 071757
Sierra Club
2101 Webster St., #1300
Oakland, CA 94612
(415) 977-5560
joshua.smith@sierraclub.org

Isabella Ariza
DC Bar ID No. 90033154
Sierra Club
50 F. St. NW 8th Floor
Washington, DC 20001
(857) 999-6267
isabella.ariza@sierraclub.org

*Counsel for Petitioner Sierra
Club*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.   25-2042        Caption:  National Parks Conservation Ass'n and Sierra Club v. EPA

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sierra Club
(name of party/amicus)


 who is                Petitioner            , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:


12/01/2019 SCC                              - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Charles McPhedran          Date: January 28, 2026

Counsel for: Sierra Club

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. ___25-2042___     Caption: National Parks Conservation Ass'n and Sierra Club v. EPA

Pursuant to FRAP 26.1 and Local Rule 26.1,

National Parks Conservation Association
(name of party/amicus)

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

12/01/2019 SCC                                     - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: __s/ Charles McPhedran_____      Date: ___January 28, 2026___

Counsel for: __National Parks Conservation Ass'n__

- 2 -

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................... ii

TABLE OF AUTHORITIES ...............................................................................v

GLOSSARY............................................................................................................x

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...............................1

BACKGROUND ...................................................................................................2

   I.   The Clean Air Act's Regional Haze Program ......................................2

      A.  Haze plans must make reasonable progress.................................4

      B.  Uniform rates of progress are not a safe harbor..........................6

  II.  Haze Pollution From West Virginia Sources .......................................7

  III.  The West Virginia Plan........................................................................12

      A.  In January 2025, EPA disapproved West Virginia's haze revision for failure to comply with the Act and the Regional Haze Rule ................12

      B.  In April 2025, EPA proposed approval based on a New Policy that makes the uniform rate of progress a safe harbor .....................................13

STANDARD OF REVIEW ................................................................................15

SUMMARY OF ARGUMENT ..........................................................................15

STANDING ........................................................................................................17

ARGUMENT ......................................................................................................22

ii

I.   EPA's New Policy Violates the Act. ...................................................22

   A.   The New Policy is Contrary to the Act. .....................................22

   B.   The New Policy Contradicts the "Best Reading" of the Act. ....................26

   C.   The New Policy is Contrary to the Regional Haze Rule. ..........................29

II.  EPA's Reversal of the National Uniform Rate of Progress Policy Violates the Act's Procedural Requirements ...............................................31

III. EPA Failed to Provide a Rational Basis for its Reversal of Position from Disapproval to Approval of the West Virginia Plan. ....................................34

IV.  The West Virginia Plan Fails to Satisfy the New Uniform Rate of Progress Policy......................................................................36

   A.   The West Virginia Plan Fails to Demonstrate that All Affected Class I Areas Are on or Below the Uniform Rate of Progress. .............................36

   B.   EPA unlawfully approved a West Virginia Plan that Failed to Fully Evaluate the Mandatory Statutory Factors for Sources "Subject To" Reasonable Progress..............................................................43

   A.   West Virginia's Evaluation of New Scrubbers is Flawed. .......................48

   B.   West Virginia Arbitrarily Failed to Evaluate Cost-Effective Efficiency Improvements..............................................................49

CONCLUSION AND RELIEF REQUESTED ......................................................56

CERTIFICATE OF COMPLIANCE................................................................58

iii

CERTIFICATE OF SERVICE ..............................................................................59

STATUTORY AND REGULATORY ADDENDUM

iv

## TABLE OF AUTHORITIES

**Cases**

*1000 Friends of Md. v. Browner*, 265 F.3d 216 (4th Cir. 2001) ............................15

*Am. Lung Ass'n v. EPA*, 134 F.3d 388 (D.C. Cir. 1998) .....................................3, 20

*Babbitt v. Sweet Home Chapter Communities for Great Ore.*,
515 U.S. 687 (1995)....................................................................................39

*Bennett v. Spear*, 520 U.S. 154 (1997) ..................................................................21

*FCC v. Fox Television Stations, Inc.*, 566 U.S. 502 (2009) ....................... 17, 35, 36

*Friends of Buckingham v. State Air Pollution Control Bd.*,
947 F.3d 68 (4th Cir. 2020) .......................................................................15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000).............................................................................. 18, 20

*Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002) .................................................25

*Getty v. Federal Savings and Loan Ins. Corp.*,
805 F.2d 1050 (D.C.Cir. 1986).....................................................................25

*Int'l Union, United Auto., Aerospace and Agric. Implement
Workers of Am. v. Brock*, 477 U.S. 274 (1986) ...................................................21

*Loper Bright v. Raimando*, 603 U.S. 369 (2024)............................................. *passim*

*Am. Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505 (4th Cir. 2003) ................18

*Market Co. v. Hoffman*, 101 U.S. 112 (1879)........................................................39

*Michigan v. EPA*, 576 U.S. 743 (2015) ................................................................39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................................................................................15

*Nat'l Petrochemical & Refiners Ass'n. v. EPA*,
   287 F.3d 1130 (D.C. Cir. 2002)..................................................................25

*Pulsifer v. United States*, 601 U.S. 124 (2024)........................................28

*Russello v. United States*, 464 U.S. 16 (1983).........................................40

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
   472 F.3d 882 (D.C. Cir. 2006)......................................................................3

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
   489 F.3d 1245 (D.C. Cir. 2007)....................................................................3

*United States v Menasche*, 348 U.S. 528 (1955) .....................................39

*Util. Air Regulatory Grp. v. EPA*, 471 F.3d 1333 (D.C. Cir. 2006).........2

**Statutes**

5 U.S.C. § 706.............................................................................................28

42 U.S.C. § 7410(a)(2)(D) ..........................................................................40

42 U.S.C. § 7410(c)(1)...................................................................................4

42 U.S.C. § 7410(k)(3)...................................................................................4

42 U.S.C. § 7411(b)(1)(A) ..........................................................................40

42 U.S.C. § 7413(a) ....................................................................................40

42 U.S.C. § 7472(a) ..................................................................................2, 4

42 U.S.C. § 7491 ............................................................................. 27, 28, 29

42 U.S.C. § 7491(a)(1)...................................................................... 3, 23, 28

42 U.S.C. § 7491(a)(3)................................................................................40

42 U.S.C. § 7491(a)(4)...................................................................................4

42 U.S.C. § 7491(b)(2)...................................................................... *passim*

42 U.S.C. § 7491(b)(2)(B) ..........................................................25

42 U.S.C. § 7491(g).....................................................................27

42 U.S.C. § 7491(g)(1)..................................... 5, 6, 14, 28, 44, 45

42 U.S.C. § 7491(g)(2)....................................................................6

42 U.S.C. § 7492(a) .......................................................................40

42 U.S.C. § 7512a(c).....................................................................40

42 U.S.C. § 7513(f) .......................................................................40

42 U.S.C. § 7607(b)(1)..................................................................1, 5

42 U.S.C. § 7607(d)(1)(j)...............................................................34

42 U.S.C. § 7607(d)(3)...................................................................34

42 U.S.C. § 7607(d)(5)...................................................................34

42 U.S.C. § 7601(a)(2)(A) .............................................................31

**Regulations**

40 C.F.R. § 51.308 ........................................................................29

40 C.F.R. § 51.308(b) ......................................................................4

40 C.F.R. § 51.308(d) ....................................................................23

40 C.F.R. § 51.308(d)(1)(i)(B)........................................................23

40 C.F.R. § 51.308(f) ......................................... 4, 5, 37, 39, 41

40 C.F.R. § 51.308(f)(1)(vi)..............................................................6

40 C.F.R. § 51.308(f)(2) ............................................................... 23, 30, 36, 38

40 C.F.R. § 51.308(f)(2)(i)................................................................ *passim*

40 C.F.R. § 51.308(f)(2)(iii) ...................................................................41

40 C.F.R. § 51.308(f)(2)(iv)......................................................................5

40 C.F.R. § 51.308(f)(3) ............................................................... 14, 24, 30, 37

40 C.F.R. § 51.308(f)(3)(ii)(A).................................................................5

40 C.F.R. § 51.308(f)(3)(ii)(B) .................................................................5

40 C.F.R. § 56.5 ................................................................................ 32, 33

40 C.F.R. § 56.5(a)(2) ...........................................................................33

40 C.F.R. § 56.5(b) ........................................................................... 31, 32

40 C.F.R. § 56.5(c).................................................................................31

**Federal Register Notices**

44 Fed. Reg. 13,043 (Mar. 9, 1979)..........................................................31

64 Fed. Reg. 35,714 (Jul. 1, 1999)........................................................2, 39

70 Fed. Reg. 39,104 (Jul. 6, 2005)...........................................................50

76 Fed. Reg. 81,728 (Dec. 28, 2011) .........................................................3

77 Fed. Reg. 16,937 (Mar. 23, 2012).........................................................7

82 Fed. Reg. 3078 (Jan. 10, 2017) ..................................................... *passim*

90 Fed. Reg. 6932 (Jan. 21, 2025) ..................................................... *passim*

90 Fed. Reg. 16,478 (Apr. 18, 2025) .................................................. 14, 23, 27, 37

90 Fed. Reg. 29,737 (Jul. 7, 2025).................................................................... *passim*

**Other Authorities**

H.R. Rep. No. 95-294 (1977)....................................................................3

H.R. Rep. No. 95-564 (1977)....................................................................4

Pub. L. No. 95-95, 91 Stat. 685 (1977)....................................................2

ix

## GLOSSARY

BART      Best Available Retrofit Technology

EPA       United States Environmental Protection Agency

NPCA      National Parks Conservation Association

$SO_2$       Sulfur Dioxide

URP       Uniform Rate of Progress

**JURISDICTIONAL STATEMENT**

This petition for review challenges the final action of the U.S. Environmental Protection Agency ("EPA"), *Air Plan Approval; West Virginia Regional Haze Implementation Plan for the Second Implementation Period*, 90 Fed. Reg. 29,737 (Jul. 7, 2025) ("Final Rule;" the West Virginia Regional Haze Implementation Plan for the Second Implementation Period approved by this Final Rule is hereinafter "West Virginia Plan"). Sierra Club and National Parks Conservation Association ("NPCA") timely filed the petition for review on September 4, 2025, within 60 days of the Final Rule's publication; therefore, this court has jurisdiction. 42 U.S.C. § 7607(b)(1).

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

The Act and its implementing regulations require states to submit plans to EPA to improve visibility in national parks and wilderness areas. The issues presented in this proceeding are whether EPA's approval of the West Virginia Plan was unlawful and arbitrary where:

(1) EPA's adoption of a New Policy regarding consideration of the uniform rate of progress (sometimes referred to as "the URP" or "glidepath") and reasonable progress toward natural visibility conditions was contrary to the Clean Air Act ("the Act");

1

(2) EPA failed to follow required procedures under the Act and its own regulations in departing from longstanding policy;

(3) The West Virginia's Plan did not satisfy EPA's own New Policy; and

(4) EPA failed to provide a rational basis for its reversal of position from disapproval to approval of the West Virginia Plan.

## BACKGROUND

### I.    The Clean Air Act's Regional Haze Program

In 1977, with bipartisan support, Congress passed amendments to the Act to protect air quality in national parks and wilderness areas for future generations. Pub. L. No. 95–95, 91 Stat. 685 (1977). Congress was responding to the unfortunate reality that most national parks and wilderness areas suffer from air pollution that obscures scenic vistas and endangers human health. *See* H.R. Rep. No. 95-564, at 155, 189 (1977) (Conf. Rep.), *reprinted in* 1977 U.S.C.C.A.N. 1502, 1536; 64 Fed. Reg. 35,714, 35,715 (Jul. 1, 1999) (the "overriding" and "paramount" goal of the Act is to protect public health). "[I]n the eastern United States, the average visual range in most natural parks and wilderness areas designated as Class I Federal areas, *see* 42 U.S.C. § 7472(a), is less than 30 kilometers, about 20 percent of what it would be under natural conditions." *Util. Air Regulatory Grp. v. EPA*, 471 F.3d 1333, 1334 (D.C. Cir. 2006). Anthropogenic visibility impairment is caused primarily by emissions of

2

particulate matter and its precursors (e.g., sulfur dioxide ("$SO_2$") and nitrogen oxides) from fossil fuel combustion, which react in the atmosphere to form "haze" pollution that occurs many miles away from the source. 82 Fed. Reg. 3078, 3093 (Jan. 10, 2017).[1]

The same air pollutants that obscure visibility cause serious diseases. For instance, "$SO_2$ emissions that cause visibility impairment also contribute to increased asthma symptoms, lead to increased hospital visits, and can form particulates that aggravate respiratory and heart diseases and cause premature death." 76 Fed. Reg. 81,728, 81,752 (Dec. 28, 2011); *see also Am. Lung Ass'n v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1998).[2]

To protect the "intrinsic beauty and historical and archaeological treasures"[3] of public lands, Congress set "as a national goal" clearing the nation's parks and wilderness areas of human-caused haze pollution and returning these areas to their natural state. 42 U.S.C. § 7491(a)(1). The Act designates such national parks and

---

[1] Haze sometimes occurs as a distinct plume of pollution, but often as a more uniform layer of "regional haze," occurring when particulate matter scatters or absorbs light reducing the clarity, color, and visible distance one can see. 82 Fed. Reg. at 3081.

[2] Power plants also emit particulate matter and nitrogen oxides that react with other compounds to form ground-level ozone, which in turn "can cause lung dysfunction, coughing, wheezing, shortness of breath, nausea, respiratory infection, and in some cases, permanent scarring of the lung tissue." *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 887 (D.C. Cir. 2006) (citation omitted), *decision clarified on denial of reh'g*, 489 F.3d 1245 (D.C. Cir. 2007).

[3] H.R. Rep. No. 95-294, at 203 (1977), reprinted in 1977 U.S.C.C.A.N 1077, 1282.

3

wilderness areas as "Class I areas" that are afforded the strongest protections under the Act. *Id*. § 7472(a). Congress also directed EPA to issue regulations to ensure that Class I areas make "reasonable progress" toward achieving the national visibility goal. *Id*. § 7491(a)(4).

To that end, EPA adopted the Regional Haze Rule requiring "the states" to periodically develop and submit "comprehensive" regional haze implementation plans every ten years (i.e., planning periods), wherein each plan must include "emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress toward meeting the national goal." 42 U.S.C. § 7491(b)(2); 40 C.F.R. §§ 51.308(b), (f). EPA, in turn, must evaluate each state's plan, 42 U.S.C. § 7410(k)(3); if it determines that a state's plan does not comply with the Act, EPA must promulgate a federal plan that remedies the shortcomings. *Id*. § 7410(c)(1). Relevant here is the West Virginia regional haze plan for the second planning period.

A.    Haze plans must make reasonable progress.

The Act and the Regional Haze Rule include several interlocking measures designed to make "reasonable progress" towards achieving the Act's natural visibility mandate. Each haze plan must begin with a determination of the emission reductions "necessary to make reasonable progress" in "any" Class I area where pollution from within the state "may reasonably be anticipated to cause or

4

contribute to any impairment of visibility." 42 U.S.C. § 7491(b)(2); 40 C.F.R. § 51.308(f). In evaluating and establishing the emission limits necessary to make reasonable progress, the state "shall" consider four statutory reasonable progress factors: (1) the costs of compliance; (2) the time necessary for compliance; (3) the energy and non-air quality environmental impacts of compliance; and (4) the remaining useful life of "any existing source subject to" the reasonable progress requirements. 42 U.S.C. §§ 7491(b)(1), (g)(1); 40 C.F.R. §§ 51.308(f)(2)(i), (f)(2)(iv). Based on the emission reductions identified through the analysis of these four statutory factors, each state must then establish "reasonable progress goals" that ensure improvement toward natural visibility conditions. 40 C.F.R. § 51.308(f); *see also* 42 U.S.C. § 7491(b)(2).

States must evaluate available pollution reduction measures for *all* sources that may reasonably be anticipated to cause or contribute to "any" visibility impairment in "any" Class I area—not just older, disproportionately polluting sources. 42 U.S.C. § 7491(b)(2); 40 C.F.R. § 51.308(f)(3)(ii)(A)–(B). Importantly, "visibility improvement" is not a statutory factor in establishing reasonable progress goals or the emission reductions necessary to achieve them. While the Act requires that five factors be considered when determining the best available retrofit technology ("BART") at older, higher-polluting sources that "cause" or "contribute" to haze in Class I areas—including "the degree of improvement in

5

visibility which may reasonably be anticipated to result from the use of such technology"—this requirement is absent from the reasonable progress analysis. *Compare* 42 U.S.C. § 7491(g)(2), *with id.* § 7491(g)(1).

B.  Uniform rates of progress are not a safe harbor.

For each protected national park or wilderness area, "the state" must determine current or "baseline" visibility conditions, measured in deciviews, and determine a "uniform rate of progress," which is the amount of progress that, if kept constant each year, would achieve natural visibility conditions by 2064.  40 C.F.R. § 51.308(f)(1)(vi).[4] A Class I area is considered "below" its uniform rate of progress when its projected visibility impairment conditions at the end of the planning period are lower, and therefore better, than the visibility level uniform rate of progress glidepath. Notably, under EPA's 2017 Regional Haze Rule revision and longstanding national policy, the uniform rate of progress is "not a safe harbor," 82 Fed. Reg. at 3093, 3099–4000, and states cannot reject pollution controls that satisfy the four statutory factors based on a reasonable progress analysis by claiming Class I areas are below their respective uniform rates of progress. Thus, to satisfy the Act's mandate to demonstrate "reasonable progress"

---

[4] The Regional Haze Rule uses the "deciview" as the principal metric measuring visibility impairment (or light extinction) across the entire range of visibility conditions, from pristine to extremely hazy. Most people can detect a change in visibility of one deciview. 82 Fed. Reg. at 3083.

toward eliminating visibility impairment in the national parks, states must identify available pollution controls and conduct four factor analyses for sources that contribute to regional haze.

## II.     Haze Pollution From West Virginia Sources

West Virginia is home to two Class I areas protected under the haze program: Dolly Sods Wilderness Area and Otter Creek Wilderness Area. 77 Fed. Reg. 16,937, 16,940 (Mar. 23, 2012). These wilderness areas provide habitat for a range of wildlife species and year-round recreational opportunities for residents and visitors. People visit Dolly Sods to enjoy "the hiking, the plant-life, with dense rhododendron stands and forests," Declaration of Chris Craig ¶8 (Dec. 12, 2025) ("Craig Decl."), and to appreciate its "many different ecosystems," that "make[] it so attractive," Declaration of Elizabeth Taylor ¶8 (Dec. 10, 2025) ("Taylor Decl."). People visit Otter Creek to find "another climate, where it is cool and moist" during "intense heat and drought." Craig Decl. ¶7. Both Dolly Sods and Otter Creek attract visitors for their "breathtaking" vistas, Craig Decl. ¶7, "beautiful scenery," Declaration of Bill Price ¶5 (Dec. 9, 2025) ("Price Decl."), and "panoramic views," Declaration of Samantha Nygaard ¶9 (Jan. 14, 2026) ("Nygaard Decl.").

Multiple West Virginia power plants emit significant amounts of air pollutants impacting Dolly Sods, Otter Creek, and other Class I areas, including,

but not limited to, the Great Smoky Mountains, Shenandoah, and Mammoth Cave.[5]

Despite those impacts, West Virginia did not conduct comprehensive four factor analyses evaluating the "full range of potentially reasonable options for reducing emissions" for any of the power plants.[6] Neither West Virginia nor EPA required *any* of the facilities in the state to install emissions controls, even though each of these facilities contributes to haze pollution to one or more Class I areas.

The table below provides a summary of West Virginia's evaluation of the sources that the state determined were subject to a reasonable progress analysis for potential pollution reductions. *See generally* West Virginia Plan §§ 7.4–7.9 (JA____-__). After identifying Class I areas that are "significantly impacted" by West Virginia haze pollution, *id*. at 101 (JA____), current and projected visibility conditions, *id*. § 7.2.5.1 (JA____), and the haze-causing pollutants with the greatest impacts to those areas, *id*. § 7.4 (JA____), the state conducted a multi-step evaluation of third-party modeling to identify the facilities "significantly impacting" Class I visibility, and therefore subject to the Regional Haze Rule's reasonable progress requirements. *Id*. at 168 (JA____); 181 (JA____); 189

---

[5] Nat'l Parks Conservation Ass'n, *West Virginia Source Analysis* (2024), https://arcg.is/i9Hqu; NPCA, Sierra Club, et al., Comments on Proposed Air Plan Disapproval at 12, n.51(Feb. 20, 2025) (EPA-R03-OAR-2025-0174-0072) (JA____).

[6] Memo. from Peter Tsirigotis, Director, to Regional Air Division Directors on Clarifications Regarding Regional Haze State Implementation Plans for the Second Implementation Period, 7 (July 8, 2021) (JA____) ("EPA Clarifications Memo")

(JA____); *see generally id*. § 7.6 through 7.7 (JA____-__). Based on air quality modeling of projected 2028 emissions, West Virginia determined that facilities contributing 1.00% or more of the sulfur dioxide haze pollution in Class I areas would be subject to reasonable progress analysis. *See generally id*. § 7.6 (JA____). West Virginia ultimately selected six of the state's most-significant sources of haze pollution—all coal-burning power plants—for "reasonable progress analysis" of potential pollution control measures. *Id*. at 189, tbl. 7-32 (JA____); *see also id*. tbls. 7-12, 7-13, 7-19, 7-20 (JA____,__,__,__).

For each of the six selected facilities, West Virginia decided that no pollution control measures for any source were necessary to ensure reasonable progress. *Id*. at 211 (JA____). The record demonstrates, however, that there are readily-available, affordable efficiency improvements for each of these facilities' existing sulfur dioxide control systems that would yield significant pollution reductions relative to historical emissions.[7] West Virginia selected sources for further control analysis based on anticipated 2028 emissions, *id*. at 166, tbl. 7-17, and potential pollution reductions reflected in Table 1 below are based on recent

---

[7] Joe Kordzi, A Review of EPA's Proposed Disapproval of the West Virginia Regional Haze State Implementation Plan at 16–17 (Feb. 2025) (EPA-R03-OAR-2025-0174-0072_attachment_3) (JA____-__)("Kordzi 2025 Report"); *see also* West Virginia Plan, App. H-2 at 20–30 (Nat'l Park Serv., Oct. 26, 2021 Comments on West Virginia Plan recommending evaluation of cost-effective upgrades and pollution control efficiencies for West Virginia coal plants) (JA____).

emissions data. Nevertheless, Table 1 illustrates the pollution benefits available from optimizing the existing controls at each facility, given that the West Virginia Plan does not include *any* enforceable emission control requirements for these six facilities.

**Table 1: Sources Selected by West Virginia for Four Factor Control Analysis[8]**

| Coal plant | Estimated SO2 emissions (tons per year)[9] | Highest Impacted West Virginia Class I Area (distance)[10] | Contr- ibution to Haze[11] | Four Factor Analysis required? | Full Four Factor Analysis conducted? | SO2 pollution avoidable with improved controls (tons per year)[12] |
|---|---|---|---|---|---|---|
| Harrison | 10,082.94 | Dolly Sods (83.6 km)[13] | 7.65% | Yes. | No | **5,617** |
| Pleasants Power | 16,817.43 | Otter Creek (148.3 km)[14] | 4.52% | Yes. | No. | **5,965** |

[8] West Virginia Plan at 189, tbl. 7-32 (JA____).
[9] West Virginia Plan at 142, tbl. 7-17, (JA____); Nat'l Parks Conservation Ass'n, Sierra Club, et al., Conservation Organizations' Comments on the Proposed Regional Haze State Implementation Plan at 10 (Jan. 10, 2022) ("Conservation Group 2022 Comments") (JA____).
[10] West Virginia Plan at 144–5, tbls. 7-19, 7-20 (JA____-__).
[11] *Id*.
[12] Kordzi 2025 Report at 16–7, tbl. 2 (JA____-__) (calculated based on average avoided annual emission from 2020-24).
[13] Harrison also contributes 6.93% of the SO2 haze pollution in Otter Creek, 72.8 km away. West Virginia Plan at 145, tbl.7-20 (JA____).
[14] Pleasants Power also contributes 4.46% of the SO2 haze pollution in Dolly Sods, 163.9 km away.

10

| Mitchell | 5,372.40 | Otter Creek (136.8 km)[15] | 1.66% | Yes. | No | **180** |
|---|---|---|---|---|---|---|
| John E. Amos | 10,984.24 | Otter Creek (198 km)[16] | 1.39% | Yes. | No. | **1,405** |
| Fort Martin | 4,881.87 | Dolly Sods (79.8 km)[17] | 1.20% | Yes. | No | **511** |
| Grant Town | 2,210.25 | Dolly Sods (81.3 km) | 1.04% | No. | No.[18] | **637** |

The State's failure to conduct adequate four factor analyses is especially consequential because, as Table 1 above shows, each of the listed West Virginia sources could achieve substantial sulfur dioxide reductions using readily-available, cost-effective measures to optimize the existing scrubber technology at just six facilities. Those efficiency improvements could significantly reduce West

---

[15] Mitchell also contributes 1.52% of the SO2 haze pollution in Dolly Sods, 144.2 km away. *Id*. at 144, tbl. 7-19 (JA____).

[16] Amos also contributes 1.22% of the SO2 haze pollution in Dolly Sods, 219.8 km away. *Id*. at 144, tbl. 7-19 (JA____).

[17] Fort Martin also contributes 1.07% of the total SO2 haze pollution in Otter Creek, 82.7 km away. Id. at 145, tbl. 7-20 (JA____).

[18] West Virginia DEP predetermined that a reasonable progress four factor analysis was unnecessary for Grant Town without contacting the plant. West Virginia Plan at 197 (JA____).

11

Virginia's haze pollution–yet West Virginia arbitrarily refused to even evaluate these measures. EPA nonetheless approved the West Virginia Plan.

## III.   The West Virginia Plan

The plan at issue here covers West Virginia's revised plan second planning period, dated August 12, 2022.

> A.   In January 2025, EPA disapproved West Virginia's haze revision for failure to comply with the Act and the Regional Haze Rule.

EPA's original proposed disapproval found that West Virginia's regional haze revision did not meet the Act's mandate to "contain a long-term strategy for making reasonable progress" that "consider[s] the four factors in determining reasonable progress," or the "requirement … to contain the emissions limits, schedules of compliance and other measures as may be necessary to make reasonable progress." 90 Fed. Reg. 6932, 6951 (Jan. 21, 2025). In addition, the plan was "insufficiently robust" and "inadequately justified" in its selection of sources for the evaluation of emissions measures, failed to "to discuss or adequately evaluate" improvements to existing pollution reduction measures, and failed to adequately explain "the absence of any new measures." *Id*.

EPA also proposed to find that West Virginia failed to explain why it never performed its own comprehensive four factor analysis for the sources with the greatest contribution to visibility impairment. Although West Virginia requested full four factor analyses from five facilities with the most significant contribution

12

to visibility impairment (coal plants Harrison, Fort Martin, Mitchell, Amos and Pleasants), each of those facilities refused to conduct the required analysis, claiming that because the affected Class I areas were already on the uniform rate of progress, no controls were necessary and new controls would be infeasible. West Virginia Plan at 189 (JA____). West Virginia accepted those facilities' assertions without scrutiny and declined to evaluate whether there were available, cost-effective emission reduction measures at any of them. EPA noted that "[i]t is unclear whether [the West Virginia Department of Environmental Protection (WV DEP)] relied on the justifications provided by [Harrison, Fort Martin, Mitchell, and Amos], though WV DEP never performed its own full four factor analysis for any of those four facilities." 90 Fed. Reg. at 6944. EPA proposed to find that the only facility that did conduct a four factor analysis (Pleasants) had improperly concluded that no emission reductions were reasonable. Thus, EPA originally proposed to disapprove the revision to West Virginia's Regional Haze plan due, in part, to these flawed and incomplete four factor analyses.

B.  <u>In April 2025, EPA proposed approval based on a New Policy that makes the uniform rate of progress a safe harbor.</u>

On April 18, 2025, EPA suddenly reversed course, withdrew its proposed disapproval, and proposed to approve the West Virginia Plan based, in part, on a new policy that if visibility conditions for Class I areas impacted by the state are below the uniform rate of progress, and the plan at least mentions the four

13

reasonable progress factors, then the revision is sufficient to presumptively approve the state's plan. 90 Fed. Reg. 16,478, 16,483 (Apr. 18, 2025) ("New Policy"). EPA's New Policy is a significant departure from EPA's 2017 Regional Haze Rule revision and its longstanding national policy that the uniform rate of progress is "not a safe harbor," such that a state cannot reject cost-effective pollution controls simply by claiming that a protected area is at or below the glidepath. 82 Fed. Reg. at 3093, 3099-100 (Jan. 10, 2017). Four factor analyses are a core statutory requirement of the regional haze program: the Act requires states to identify a reasonable range of potential pollution controls and evaluate the four statutory "reasonable progress" factors for any existing source, subject to the Act's reasonable progress requirements–i.e., any sources that contribute to any visibility impairment in any Class I area. 42 U.S.C. §§ 7491(b)(2), (g)(1); 40 C.F.R. § 51.308(f)(3); EPA Clarifications Memo at 7 (JA____). Yet, as explained below, West Virginia did not require, evaluate, or conduct a full four factor analysis for numerous sources, which the state determined were subject to reasonable progress. Nevertheless, on July 7, 2025, EPA approved the West Virginia Plan. 90 Fed. Reg. 29,737 (Jul. 7, 2025).

14

## STANDARD OF REVIEW

The Final Rule approving the West Virginia Plan must be vacated if the decision was arbitrary, capricious, or contrary to law. *1000 Friends of Md. v. Browner*, 265 F.3d 216, 229 (4th Cir. 2001).

Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 83–4 (4th Cir. 2020).

In *Loper Bright v. Raimando*, 603 U.S. 369, 400 (2024), the Supreme Court held that courts reviewing agency action should apply the "best reading" of the statute.

## SUMMARY OF ARGUMENT

EPA's New Policy regarding reasonable progress and the uniform rate of progress is contrary to the Act. The Act requires states to apply a four factor test as part of the core statutory requirement of reasonable progress. Instead, the New

15

Policy would allow states to avoid this test under certain circumstances; in the case of the West Virginia Plan, EPA has used it to allow West Virginia to require no reductions in haze-causing pollution. State air pollution agencies agree that the New Policy is impermissible under the Act. Further, the New Policy contradicts the "best reading" of the Act under *Loper Bright*, as demonstrated by the plain text of the Act and other traditional tools of statutory construction. The New Policy is also contrary to EPA's own Regional Haze Rule.

Further, EPA failed to follow procedures required under the Act when it reversed its policy on the uniform rate of progress. EPA's own regulations require uniformity and consistency among regional offices implementing the Act, including interoffice review and concurrence. EPA's attempts to avoid application of these policies fail in light of the issuance of the Final Rule by an EPA regional office, the requirements of EPA's own regulations, the inconsistency of the Final Rule with actions by other EPA regional offices, and EPA's failure to follow procedures under the Act related to revising visibility regulations.

Even if it were lawful to apply EPA's New Policy to the West Virginia Plan, the Plan fails to meet the New Policy's criteria. Fundamentally, it fails to demonstrate that all affected Class I areas are at or below the uniform rate of progress. EPA's attempts to claim that impacts in some areas are unavailing, based on the plain language of the Act; EPA's impermissible attempt to read a visibility

16

threshold into the Act; and the failure of EPA's alternative rationales under the rulemaking record and EPA's own regional haze regulations.

Additionally, it was unlawful for EPA to approve the West Virginia Plan, as it failed to evaluate mandatory statutory factors at sources subject to reasonable progress requirements. EPA's attempts to justify the failure to conduct the four factor analysis at these sources are contrary to the plain language of the Act and EPA's own guidance.

Finally, EPA failed to provide a rational basis for its reversal of position from disapproval to approval of the West Virginia Plan. EPA's proposed disapproval cited noncompliance with the Act and EPA's regulations, West Virginia's unreasonable rejection of the reasonable progress determination, inadequate documentation, and reliance on the uniform rate of progress to forego analysis of emissions measures. EPA's change in position failed to meet the standards set by the Supreme Court in *FCC v. Fox Television Stations, Inc.*, 566 U.S. 502 (2009). EPA failed to acknowledge or address its prior rationales that found that the West Virginia Plan violated the Act and EPA regulations, and a review of individual plants demonstrates that the Plan still violates the provisions.

## STANDING

Sierra Club and NPCA have standing to challenge EPA's action on the West Virginia Plan. To satisfy Article III's standing requirements, "a plaintiff must show

17

(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–1 (2000). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 181. "In the environmental litigation context, the standing requirements are not onerous. 'Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.'" *Am. Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Laidlaw*, 528 U.S. at 183).

Sierra Club and NPCA satisfy each element of Article III's test for standing. First, Sierra Club and NPCA members regularly visit the Class I areas in West Virginia and elsewhere that are impaired by air pollution from West Virginia. They are therefore harmed by EPA's approval of the West Virginia plan, which fails to require any additional reductions in haze-causing pollution. Sierra Club members,

18

for example, visit Otter Creek and Dolly Sods to, among other things, enjoy the unique vistas, and therefore each is harmed by the haze that diminishes views in these otherwise wild places. Craig Decl. ¶7 (recounting leading a trip in Otter Creek and experiencing "breathtaking" views); Taylor Decl. ¶¶ 9–11 (describing hiking in Dolly Sods, where views are impaired by haze pollution); Price Decl. ¶10 (explaining that haze pollution in Dolly Sods harms his ability to view and enjoy "the iconic landscapes"). As one Sierra Club member explained, Petitioners' members avoid hiking in Class I areas due to hazy air conditions. Taylor Decl. ¶9 ("[O]n some occasions, I have also encountered hazy conditions that make it impossible to see the landscape. I try to avoid Dolly Sods when I know air quality will be poor"). NPCA members similarly experience harmful haze in Class I areas. Nygaard Decl. ¶12 (stating that "haze pollution in and around the Dolly Sods area has worsened"); Schaberl Decl. ¶10 (describing experiences with haze in Shenandoah, stating that "I still encounter haze pollution in the park during the summertime, in particular"). Another NPCA member affirms that "[o]n past visits to Dolly Sods, [she has] been met with blurry and dull views," "could see haze pollution hovering over Dolly Sods from [her] car," and her "enjoyment of Dolly Sods would significantly improve if the haze was reduced" and she "did not have to worry as much about visibility or health impacts when visiting." Nygaard Decl. ¶¶11–12. NPCA and Sierra Club members live, work, and recreate in areas where

19

they suffer from breathing excess air pollution from West Virginia power plants. Taylor Decl. ¶11; Nygaard Decl. ¶¶8–12. This is sufficient to demonstrate injury-in-fact for purposes of Article III.[19]

Second, Petitioners' harms from haze pollution are fairly traceable to EPA's approval of the West Virginia Plan. Indeed, the record makes clear that West Virginia pollution, and emissions from West Virginia power plants, in particular, significantly contribute to visibility impairment in Dolly Sods, Otter Creek, and other Class I areas in the region. *See, e.g.*, West Virginia Plan at 168 (JA____) (explaining that Tables 7-21 through 7-27 reflect sources that "significantly impact[]" visibility impairment in affected Class I areas); see also *id*. tbls. 7-28, 7-29 (JA____-__) (reflecting percentage contribution from each West Virginia power plant to visibility impairment at Dolly Sods and Otter Creek). The West Virginia Plan and Final Rule result in little to no reductions in air pollution beyond what West Virginia facilities are already emitting. The Final Rule therefore consigns Sierra Club's and NPCA's members to continue breathing more polluted air and otherwise experience worsening air quality in Class I areas than the natural visibility goal mandated by the Act.

---

[19] *Friends of the Earth, Inc.*, 528 U.S. at 183–4; *see also Am. Canoe Ass'n,* 326 F.3d at 520 (plaintiffs "clearly established injury in fact because they have alleged harm to their recreational, aesthetic, and commercial interests…").

20

Third, if this Court were to grant the petition for review and remand to EPA to consider requiring more stringent pollution limits for West Virginia sources, then the aesthetic, recreational, and health harms to NPCA and Sierra Club members would be redressed. *See Bennett v. Spear*, 520 U.S. 154, 170–71 (1997) (plaintiffs satisfied the "relatively modest" redressability requirement where a finding that the agency had acted illegally would require the agency to reevaluate its final decision). Moreover, as Table 1 above shows, the specific West Virginia sources at issue in this case contribute to haze pollution at the Dolly Sods and Otter Creek Class I areas, and an order remanding the West Virginia Plan could result in reductions in pollution that harm Petitioners' members.

Finally, NPCA and Sierra Club satisfy the requirements of associational standing because the interests at stake are germane to the purposes of both organizations,[20] and this case does not require the participation of any individual members. *See Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287–88 (1986). First, Petitioners' members have

---

[20] Sierra Club's mission is to protect and restore the quality of the natural and human environment, and the organization has advocated across the country, including in West Virginia, for regional haze plans that adequately protect human health and natural areas. Fashho Decl. ¶¶ 4–7. Similarly, NPCA is a nonprofit organization with a mission of protecting and enhancing America's national parks for the use and enjoyment of present and future generations. Nygaard Decl. ¶¶3–4. NPCA is an advocate for protecting and improving air quality in West Virginia's Class I areas, as well as Class I areas in nearby states impacted by pollution from West Virginia facilities. *Id.* ¶5.

21

standing in their own right (i.e., standing declarants Price, Taylor, Craig, Schaberl, and Nygaard alleged concrete injuries redressable by the relief sought). Second, the harms asserted, including threats to the recreational use of Class I areas and diminished aesthetic enjoyment, fall squarely within Sierra Club's and NPCA's missions. Third, the claims asserted and the relief requested do not require individualized proof from any particular member in the lawsuit.  NPCA and Sierra Club have standing to bring this case.

## ARGUMENT

### I.    EPA's New Policy Violates the Act.

The Final Rule announces EPA's New Policy, under which a state "will have presumptively demonstrated reasonable progress" for a Class I area impacted by the state that has visibility impairment conditions below the uniform rate of progress. 90 Fed. Reg. at 29,738. The policy is contrary to the Act, including to the "best reading" of the Act under *Loper Bright*, and is therefore unlawful.

####     A.    The New Policy is Contrary to the Act.

The reasonable progress requirement is at the center of regional haze plans under the Act as well as the visibility and air quality benefits that Congress intended these plans to provide. As EPA itself described it in its proposed rule:

> The amount of progress that is ''reasonable progress'' is based on applying the four statutory factors in CAA section 169A(g)(1) in an evaluation of potential control options for sources of visibility impairing pollutants, which is referred to as a ''four factor'' analysis.

> The outcome of that analysis is the emission reduction measures that a particular source or group of sources needs to implement to make reasonable progress towards the national visibility goal.

90 Fed. Reg. at 16,480/3 (citation omitted). Thus, application of the four factors under the Act is the basis for the emission limits and schedules of compliance that sources adopt to limit haze-causing air pollution. The resulting emission controls, in turn, assure reasonable progress towards the national goal of the haze program: "the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas [in] which impairment results from manmade air pollution." 42 U.S.C. § 7491(a)(1). The Regional Haze Rule describes reasonable progress as a "core requirement" of state haze plans, in furtherance of the goal of achieving natural visibility conditions by 2064. 40 C.F.R. §§ 51.308(d), (d)(1)(i)(B).

As a core haze requirement, reasonable progress is intertwined with other central aspects of the Regional Haze Rule. "Periodic comprehensive revisions" of haze plans, like the one now before the Court, must address reasonable progress. 40 C.F.R. § 51.308(f)(2)(i). States must submit a long-term haze strategy for each subject Class I area that includes "enforceable emission limitations, compliance schedules, and other measures that are necessary to make reasonable progress." 40 C.F.R. § 51.308(f)(2). Under the Regional Haze Rule, states must consider the same four factors as under the Act to identify these necessary emission limits and

23

measures. 40 C.F.R. § 51.308(f)(2)(i). States then establish reasonable progress goals based on the application of the necessary measures. 40 C.F.R. § 51.308(f)(3).

Instead of implementing statutory and regulatory requirements for reasonable progress towards natural visibility conditions, EPA's Final Rule provides no additional emission reductions. Merely relying on pre-existing controls is not sufficient when the national goal is far from being achieved. Instead, under EPA's New Policy, under some circumstances, states no longer have to engage with reasonable progress requirements to identify emission reductions and compliance schedules in accordance with the four congressionally mandated statutory factors. Instead, if a Class I area is below the uniform rate of progress and the state has "considered" the factors, it is presumed that no further analysis is required. 90 Fed. Reg. at 29,738.

The New Policy will allow states to evade haze requirements by insufficient four factor analyses that avoid reasonable and therefore necessary measures, and it will let EPA avoid conducting a rigorous review of state four factor analyses and reasonable progress determinations for compliance with the Act. Instead, EPA will simply check that Class I areas satisfy the uniform rate of progress and presume the sufficiency of the state's four factor analysis. But EPA cannot evade its

24

responsibility under the Act to engage with West Virginia's evaluation of the four reasonable progress factors.[21]

By its actions, EPA is allowing the uniform rate of progress to become a "safe harbor," exactly what EPA previously said is unlawful. EPA itself has noted that it would be "antithetical to allow states to avoid implementing reasonable measures until and unless" the goal of "[r]emedying existing and preventing future visibility impairment" is achieved. 82 Fed. Reg. 3078, 3094 (Jan. 10, 2017). The New Policy undermines the reasonable progress requirements of the haze program and is "antithetical" to the goals and requirements of the Act.

Moreover, the Act requires states to build on emission reductions achieved in each planning period. Congress directed that states must develop regional haze SIPs that set forth a long-term strategy "for making reasonable progress toward meeting the national goal" covering "ten to fifteen years" at a time. 42 U.S.C. §7491(b)(2)(B). The New Policy would unlawfully allow states and EPA to ignore this statutory directive to continue making progress toward the natural visibility goal in each planning period if states are able to show that all affected

---

[21] *Nat'l Petrochemical & Refiners Ass'n. v. EPA*, 287 F.3d 1130, 1145–6 (D.C. Cir. 2002) (EPA would act arbitrarily and capriciously if it failed to consider statutorily mandated factors); *Getty v. Federal Savings and Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C.Cir. 1986) ("stating that a factor was considered, however, is not a substitute for considering it") (cited in *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002)).

Class I areas are projected to be below the uniform rate of progress at the end of the period.

The Mid-Atlantic/Northeast Visibility Union ("Visibility Union"), which includes representatives of state air pollution agencies, criticized the New Policy and specifically noted its disagreement with the idea that the New Policy is permissible under the statutory language of the Act. Comments of Mid-Atlantic/Northeast Visibility Union at 1 (May 19, 2025) (EPA-R03-OAR-2025-0174-0061) (JA____). According to the Visibility Union, EPA's New Policy invoked "an extra-statutory fifth factor," the uniform rate of progress, which can override a statutory four factor analysis. *Id*. at 2 (JA____). The Visibility Union points out that the uniform rate of progress does not appear in the Act but in regulations, and it is not permissible to use the uniform rate of progress to override the four factor analysis or reasonable progress goals. *Id*. at 2–3 (JA____-__). The Visibility Union also argues that EPA is approving the West Virginia Plan without the long-term strategy required by the Regional Haze Rule. *Id*. at 3 (JA____). The Visibility Union urges disapproval of the Plan for failing to meet the basic requirements of the Act.

    B.   <u>The New Policy Contradicts the "Best Reading" of the Act.</u>

Under *Loper Bright,* courts reviewing agency action should apply the "best reading" of the statute. 603 U.S. at 400.  Several "traditional tools of statutory

construction," *id*. at 401, confirm that the best reading of the Act requires rejection of EPA's New Policy.

Most importantly, the plain text of the Act demonstrates that EPA's action unlawfully reads text and substance out of the statute. As EPA itself described in its proposed rule, reasonable progress is a "core component" of the statutory regional haze program, mandated by Congress in the Act. 90 Fed. Reg. at 16,478. State plans must include emission limits and schedule for compliance to make reasonable progress, 42 U.S.C. § 7491(b)(2), based on the four reasonable progress factors, 42 U.S.C. §7491(g). Nothing in the statutory haze program authorizes EPA to avoid reasonable progress requirements based on the status of a Class I area under the uniform rate of progress. Thus, 42 U.S.C. § 7491 of the Act, in conjunction with the "best reading" standard of *Loper Bright*, demonstrates that EPA's attempt to undercut the congressionally-mandated reasonable progress requirement is unlawful under the plain text standard.[22]

While the plain text of the Act is thus dispositive, other "traditional tools" support the finding that EPA's New Policy is unlawful. For example, *Loper Bright*

---

[22] If the *Chevron* standard were applied, EPA's action would fail under *Chevron* Step 1 as contrary to the clear intent of Congress. *Loper Bright* at *396, citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). Under the plain language of the Act, 42 U.S.C. § 7491, states apply four listed factors in evaluating reasonable progress. 42 U.S.C. § 7491. EPA's attempt to undermine this clear congressional intent by limiting this review based on an application of the uniform rate of progress would fail *Chevron* Step 1.

27

notes that "statutes can be sensibly understood only 'by reviewing text in context.'" 603 U.S. at 392, n.4 (quoting *Pulsifer v. United States*, 601 U.S. 124, 133 (2024)). The content and context of reasonable progress are readily available in 42 U.S.C. § 7491, and includes the four reasonable progress factors under 42 U.S.C. § 7491(g)(1); the requirement that state plans include "such emissions limits schedules of compliance and other measures as may be necessary to make reasonable progress toward meeting the national goal" under 42 U.S.C. § 7491(b)(2); and the "national goal of the prevention of any future, and the remedying of any existing, impairment of visibility" in 42 U.S.C. § 7491(a)(1). The overall national goal of 42 U.S.C. § 7491—"the prevention of any future, and the remedying of any existing impairment of visibility in mandatory Class I Federal areas"—provides additional context for the full implementation of reasonable progress. Thus, under the "context" factor of *Loper Bright*, EPA has no basis to nullify the reasonable progress requirement.

Further, the Court in *Loper Bright* affirms the Administrative Procedure Act provision that "the reviewing court shall decide all relevant questions of law." 603 U.S. at 391 (citing 5 U.S.C. § 706). The court should decide these questions by applying its own judgment, without deference to the administrative agency. 603 U.S. at 392. "Agency interpretations of statute . . . are not entitled to deference."

*Id.* Here, this Court should decide questions of law regarding reasonable progress and not defer to EPA's unlawful derogation of statutory requirements.

Finally, the Court in *Loper Bright* notes the interpretive value of the agency's contemporaneous construction of a statute: judicial respect for such construction "was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." 603 U.S. at 386 (citations omitted). Here, EPA promulgated the Regional Haze Rule, at issue in this proceeding, in 1999. 40 C.F.R. § 51.308. This comprehensive rule regarding 42 U.S.C. § 7491 was EPA's first regulation to implement this regional haze section. This implementation, in addition to the text of this rule regarding reasonable progress and its use of the identical four reasonable progress factors found in the statute, is a "contemporaneous construction" that supports a conclusion that this Court should reject EPA's attempt to undercut the four factors.

C.     The New Policy is Contrary to the Regional Haze Rule.

Just as the New Policy is unlawful under the statute, it cannot be reconciled with the Regional Haze Rule. The RHR's requirements for the long-term strategy track those of the Act:

> The State *must* evaluate and determine the emission reduction measures that are necessary to make reasonable progress by considering the costs of compliance, the time necessary for compliance, the energy and non-air quality environmental impacts of compliance, and the remaining

29

useful life of any potentially affected anthropogenic source of visibility impairment. . . The State must include in its implementation plan a description of the criteria it used to determine which sources or groups of sources it evaluated and *how the four factors were taken into consideration in selecting the measures for inclusion in its long-term strategy.*

40 C.F.R. § 51.308(f)(2)(i) (emphasis added). Thus, the State must determine emission reduction measures by applying the four statutory factors, which also appear in the Regional Haze Rule. Just as in the Act, there is nothing in the regulation that allows the uniform rate of progress to override the reasonable progress factors. Further, the provisions regarding reasonable progress goals under 40 C.F.R. § 51.308(f)(3) refer back to § 51.308(f)(2)'s requirement to establish enforceable emission limits, schedules of compliance, and other measures necessary to make reasonable progress. Thus, the requirement that states and EPA determine the emission reduction measures necessary to make reasonable progress based on the four factors, and not on any claims about visibility conditions, is woven throughout the Regional Haze Rule. This is consistent with EPA statements that the uniform rate of progress is not a safe harbor that would excuse reasonable control measures.[23] Thus, contrary to EPA's claim its New Policy "aligns" with the Regional Haze Rule, that policy directly contradicts and violates the Rule.

---

[23] 82 Fed. Reg. at 3093–4; *see also* Visibility Union Comments at 2 (JA____).

30

## II.    EPA's Reversal of the National Uniform Rate of Progress Policy Violates the Act's Procedural Requirements.

The Act mandates that EPA "assure uniformity" and "consistency among the Regional Offices in implementing the Act." 44 Fed. Reg. 13,043, 13,045 (Mar. 9, 1979); 42 U.S.C. § 7601(a)(2)(A). To that end, the regional offices, including the Regional Administrator, "*shall* seek concurrence from the appropriate EPA Headquarters office on any interpretation of the Act, . . . when such interpretation may result in application of the act or rule, regulation, or program directive that is inconsistent with Agency policy." 40 C.F.R. § 56.5(b) (emphasis added). Where a regional "regulatory action[] . . . involve[s] inconsistent application of the requirements of the act, the Regional Offices *shall* classify such actions as special actions," and "*shall* follow" the Agency's SIP review guidelines. 40 C.F.R. § 56.5(c). Those mandatory guidelines, in turn, require a "complete" interagency review, a "public hearing[]," and "full concurrence" from each affected EPA office (including the Administrator and the General Counsel) to ensure that any action, like approval of the West Virginia Plan and the New Policy, that "would

31

significantly affect emission control regulations," or "ha[s] significant national policy implications," is "fully analyzed." [24]

EPA admits that the final rule departs from the agency's longstanding national uniform rate of progress policy, 90 Fed. Reg. 29,738, EPA's Response to Comments for Federal Register Notice for Air Plan Approval; West Virginia; Regional Haze State Implementation Plan for the Second Implementation Period at 22 (Jul. 7, 2025) (EPA-R03-OAR-2025-0174-0076) ("RTC"), but contends that the agency's consistency regulations are irrelevant to this action. EPA is wrong, for several reasons.

First, EPA's suggestion that 40 C.F.R. § 56.5(b) does not apply because EPA generally, and "*not* merely Region 3," issued the new uniform rate of progress policy, RTC at 20, is belied by the face of the rule, which makes clear that the "Regional Administrator, Region III," *not* EPA more broadly, reviewed and signed the final rule. 90 Fed. Reg. at 29,741/3.

EPA's alternative rationale—namely, that 40 C.F.R. § 56.5 does not apply, because the Final Rule and its approval of the West Virginia Plan is consistent with

---

[24] EPA, Guidelines Revisions to State Implementation Plans—Procedures for Approval/Disapproval Actions §§ 6.1, 6.3, figs.5., 7.2. (Apr. 1975) (OAQPS No. 1.2-005A), *available at* https://tinyurl.com/wbrj2epf; *see also* EPA, SIP Consistency Issues Guide: How to Identify and Resolve SIP Consistency Issues at 6, 21–33 (May 20, 2025) (EPA-R03-OAR-2025-0174-0074_attachment_11) (JA____).

the newly "announced change in agency policy" (RTC at 20)—is similarly without merit. As an initial matter, EPA's interpretation renders 40 C.F.R. § 56.5 meaningless. Indeed, a regional office could nullify the regulatory mandate to "fully analyze"[25] inconsistent regional actions simply by unilaterally declaring that any action is based on, and consistent with, a new policy. Moreover, having admitted that the West Virginia final action departs from the national uniform rate of progress policy and "applies a new policy" to West Virginia "*alone*," RTC at 26 (emphasis added), EPA cannot credibly insist that its Final Rule was somehow consistent with the pre-existing policy.

In any case, EPA's regulations do not simply require consistency with national policy. Each regional office must also ensure that SIP actions are as consistent as reasonably possible with the activities of other EPA regions. 40 C.F.R. § 56.5(a)(2). Here, EPA's West Virginia action is inconsistent with SIP actions from nearly every other EPA region. stating that "the uniform rate of progress is not a 'safe harbor." *See* NPCA, Sierra Club, et al., Comments on Proposed Air Plan Disapproval at 21–23 (Feb. 20, 2025) (EPA-R03-OAR-2025-0174-0072) (JA____-__) (citing examples). Nevertheless, the agency failed to comply with the detailed requirements of the regional consistency regulations.

---

[25] *Id.*

33

Finally, EPA correctly notes that the agency has "authority to promulgate regulations" to assure reasonable progress, 90 Fed. Reg. at 29,739. However, the agency indisputably failed to follow the Act's detailed provisions governing the revision of any regulation related to the protection of visibility. *See* 42 U.S.C. § 7607(d)(1)(j). Before promulgating reasonable progress regulations, the Act requires EPA to, among other things, hold a public hearing and include in the docket all data, information, and documents related to the methodology for the proposed revision, as well as an explanation of the major legal interpretations underlying the rule. 42 U.S.C. §§ 7607(d)(3)–(5). Although EPA claims that the new uniform rate of progress policy falls within the agency's authority to issue regulations under the haze program, EPA failed to follow the Act's explicit requirements for revising the rule.

III.    **EPA Failed to Provide a Rational Basis for its Reversal of Position from Disapproval to Approval of the West Virginia Plan.**

As noted, in January 2025, EPA proposed to disapprove of the West Virginia Plan because it did not meet the requirements of the Act or the Regional Haze Rule. 90 Fed. Reg. 6932. EPA noted , among other flaws, that West Virginia's Plan was "inadequate[ly] support[ed]," *id*. at 6951, and West Virginia's "reliance on being at or below the [uniform rate of progress]" was not a valid basis for forgoing further analysis of emissions measures for these sources. *Id*. at 6947. In the Final Rule, however, EPA reversed course, approving West Virginia's

34

reliance on the uniform rate of progress as a basis for refusing to conduct further control analyses for sources subject to reasonable progress. That abrupt reversal was arbitrary and capricious. Under *Fox Television*, an agency may change a prior policy only if "the new policy is permissible under the statute, []there are good reasons for it," and the agency provided a reasoned explanation for departing from its previous position. 566 U.S. at 515.

Here, EPA failed to provide a reasoned explanation for its reversal. First, EPA failed to rationally explain how the uniform rate of progress policy complies with either the Act or the Rule. 90 Fed. Reg. at 29,738. As discussed above, EPA's New Policy conflicts with the plain language of the Act; thus, EPA does not have authority to ignore the four statutory factors based on the uniform rate of progress glidepath. As EPA has repeatedly recognized, "the uniform rate of progress is not based on consideration of the four statutory factors and therefore cannot answer the question of whether the amount of progress being made in any particular implementation period is 'reasonable progress.'" 90 Fed. Reg. at 6939–40. EPA's assertion that the new uniform rate of progress policy is "consistent" with "the legislative history of the Act" is without merit.[26] Nothing in the EPA's cited report or in the Act suggests that Congress intended "reasonable progress" to be evaluated by anything different than the four factor analysis the statute mandates.

---

[26] RTC at 22 (JA____).

Second, the agency failed to explain how the West Virginia Plan does not violate the Act and Regional Haze Rules in all the ways EPA previously identified in its proposed disapproval. Indeed, EPA did not dispute its earlier findings that West Virginia's submission lacked the documentation required by 40 C.F.R. §§ 51.308(f)(2) and (f)(2)(i)–(iii); it simply ignored those findings. EPA's failure to provide any discussion on the validity of West Virginia's four factor analyses underscores that EPA now views those analyses as merely "make-work" exercises under its New Policy, in violation of the Act and Regional Haze Rule. Because EPA approved West Virginia's revision without explaining its departure from its prior proposal, and because the new uniform rate of progress policy contradicts the Act, the Final Rule cannot satisfy the *Fox Television* standard.

## IV. The West Virginia Plan Fails to Satisfy the New Uniform Rate of Progress Policy.

Even if EPA's new uniform rate of progress policy was lawful (it is not), the West Virginia Plan fails to meet either of the requirements for presumptive approval.

### A. The West Virginia Plan Fails to Demonstrate that All Affected Class I Areas Are on or Below the Uniform Rate of Progress.

To ensure reasonable progress toward the Act's natural visibility goal, the Regional Haze Rule requires "the state" to follow an iterative "sequence" of steps. 82 Fed. Reg. at 3091. The state must identify affected Class I areas, determine the

36

uniform rate of progress, conduct air qualify modeling regarding future visibility conditions under the long term strategy, and compare these conditions to the uniform rate of progress. See generally 40 C.F.R. § 51.308(f); 82 Fed. Reg. 3091; 90 Fed. Reg. at 16,480. As noted, the uniform rate of progress is an analytical construct designed to "ensure that no reasonable controls were left off the table." 82 Fed. Reg. 3093. If a Class I area is above the uniform rate of progress, the state must then make a "robust demonstration," based on the four factors, that there are "no additional measures" that would be reasonable to include in the plan. 40 C.F.R. § 51.308(f)(3). As noted, however, the uniform rate of progress was never intended to be a "safe harbor" from reasonable, cost-effective controls. Instead, it is an analytical construct designed to "ensure that no reasonable controls were left off the table." 82 Fed. Reg. 3093.

Under EPA's new uniform rate of progress policy, however, the state may presumptively demonstrate "reasonable progress" if projected visibility conditions for affected Class I areas are projected to be on or below the uniform rate of progress in 2028. *See* 90 Fed. Reg. at 29,740 (explaining the "requirements of the new policy," including the requirement that states identify "each" Class I area "within" or "outside" the state that "may be affected by emissions from the state," and "reasonably document[]" that emissions from the state "are not reasonably

37

anticipated to cause or contribute to *any* impairment in *any* area that is above the uniform rate of progress") (emphasis added) (citing 40 C.F.R. § 51.308(f)(2)).

EPA admits that West Virginia "did not specifically identify all" of the out-of-state Class I areas potentially affected by the state's emissions, RTC at 30 (JA____), but instead evaluated the uniform rate of progress only for those Class I areas that are "significantly impacted" by West Virginia emissions. *Id*.; *see also* West Virginia Plan at 10, 98, 136, 164 (JA____-__). EPA further admits that West Virginia's relied-upon modeling shows that visibility in several Class I areas affected by West Virginia emissions including Everglades National Park and Caney Creek, Mingo, and Hercules Glades Wilderness Areas–are projected to be "above the [uniform rate of progress]." RTC at 30 (JA____); *see also* West Virginia Plan at 133, fig.7-10 (JA____).[27]

Although the SIP fails, on its face, to demonstrate that all potentially affected Class I areas are on or below the uniform rate of progress, EPA contends that the state has satisfied the new uniform rate of progress policy. EPA is wrong, for several reasons. As an initial matter, the agency suggests that West Virginia's contribution to some affected Class I areas that are above the uniform rate of

---

[27] Figure 7-10 reflects the Class I areas considered as part of the modeling, which West Virginia relied upon. A percentage of less than zero indicates a 2028 projected value that is below the uniform rate of progress; a percentage above zero indicates visibility conditions above the uniform rate of progress.

progress is negligible or *de minimis*. RTC at 31 (JA____). But the plain language of the Act requires that "each" SIP include emission limits as "necessary to make reasonable progress" toward natural visibility in "*any*" Class I area in which pollution from the state "*may* reasonably be anticipated to cause or contribute to *any* impairment of visibility." 42 U.S.C. § 7491(b)(2) (emphasis added). Controlling precedent mandates that terms like "each" and "any" must be given their literal, "capacious" meanings. *Michigan v. EPA*, 576 U.S. 743, 752 (2015). Moreover, EPA must "give effect, if possible, to every clause and word of a statute," *United States v Menasche*, 348 U.S. 528, 538–9 (1955), such that, "upon the whole, . . . no clause, sentence, or word shall be superfluous, void, or insignificant." *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879); *see also Babbitt v. Sweet Home Chapter Communities for Great Ore.*, 515 U.S. 687, 698 (1995) (courts are "reluctan[t] to treat statutory terms as surplusage" in any setting."). Thus, the Act makes clear that the threshold for establishing contribution is "extremely low," 64 Fed. Reg. 35,720–2, and the state must evaluate visibility in every Class I area that "may" be affected by "any" West Virginia pollution. 42 U.S.C. § 7491(b)(2); 40 C.F.R. § 51.308(f).

Moreover, EPA's argument that states may disregard *de minimis* contributions effectively reads a "significance" threshold into the Act—an impermissible result. When Congress elected to make the applicability of a

39

provision contingent on "significant" contribution or impacts, it did so expressly.[28]

In fact, other parts of the Act's visibility provisions explicitly provide EPA and the

states authority to establish visibility transport regions to address pollution from

one or more states that "contribute significantly" to impairment.[29] The provision at

issue here—42 U.S.C. § 7491(b)(2)—conspicuously omits the modifier

"significant." Courts "generally presum[e] that Congress acts intentionally and

purposely" when it "includes particular language in one section of a statute but

omits it in another." *Russello v. United States*, 464 U.S. 16, 23 (1983). Here, the

record demonstrates that West Virginia contributes a non-zero amount of pollution

to several Class I areas that do not meet the uniform rate of progress.

Consequently, the West Virginia SIP fails to satisfy EPA's new uniform rate of

progress policy.

EPA's alternative rationales are similarly without merit. EPA suggests that

the modeling upon which West Virginia relied might not take into account upwind

---

[28] *See, e.g.*, 42 U.S.C. § 7410(a)(2)(D) (requiring pollution reductions from states that "contribute significantly" to downwind nonattainment); *id.* § 7411(b)(1)(A) (requiring new source performance standards for categories of sources that "contribute[] significantly" to the endangerment of public health); *id.* § 7413a (requiring particulate matter reductions for sources that "contribute significantly" to violations of the standard); *id.* § 7512a(c) (pertaining to areas with "significant stationary source emissions" of carbon monoxide); *id.* § 7513(f) (waivers for sources that "do not contribute significantly").

[29] *Id.* § 7492(a); *see also id.* § 7491(a)(3) (requiring EPA to study and identify the types of pollutants that "may reasonably be anticipated to cause or contribute significantly to impairment of visibility").

40

pollution reductions, and that EPA's separate modeling indicates that affected Class I areas, including Everglades, Caney Creek, and Mingo, are compliant with the uniform rate of progress. RTC at 30–31. But the Regional Haze Rule requires "the state," not EPA, to identify all Class I areas that "may be affected" by pollution from West Virginia, 40 C.F.R. § 51.308(f), based on modeling data "on which the State is relying" to evaluate reasonable progress. *Id*. §§ 51.308(f), (f)(2)(iii).

EPA then attempts to shoehorn its own, separate modeling into West Virginia's uniform rate of progress analysis, by pointing to two passing references to that EPA modeling in the West Virginia Plan. RTC at 31, n.4 (JA____). But nothing in the record indicates that West Virginia relied upon or even considered EPA's modeling in evaluating whether any Class I area was on the uniform rate of progress.[30] In fact, West Virginia explicitly decided "*not*" to rely upon EPA's modeling or the agency's adjusted uniform rate of progress glidepath analyses. West Virginia Plan at 136–7 (JA____-__). EPA's modeling is therefore irrelevant to whether "the state" demonstrated reasonable progress. *See generally* 40 C.F.R. § 51.308(f) (requiring "the state," not EPA, to demonstrate reasonable progress).

---

[30] EPA asserts that the "SIP submittal references 2019 EPA modeling at pages 8 and 136 of 257." RTC at 31 n.4. Page 7 of the West Virginia Plan, however, is simply a passing citation to the many resources used by VISTAS, a multi-state regional planning organization, which conducted the modeling used by West Virginia (JA____).

41

In any event, West Virginia's modeling also demonstrates that other Class I areas affected by West Virginia emissions, including White Mountain Wilderness Area, Big Bend National Park, Guadalupe Mountains National Park, Carlsbad Caverns National Park, Bosque del Apache Wilderness Area, and Wichita Mountains Wilderness Area, are similarly projected to be *above* EPA's adjusted glidepaths. Conservation Group 2022 Comments at 33; *see also* West Virginia Plan, App. E-6 at 14–16, tbl. 4-1 (JA_____-__).[31] The record further demonstrates that West Virginia emissions do, in fact, affect those Class I areas.[32] Thus, EPA's own modeling demonstrates that West Virginia fails to satisfy the new uniform rate of progress policy.

---

[31] In Appendix E-6, tbl.4-1 of the West Virginia SIP, the third column from the right reflects modeled 2028 visibility for the most impaired days; the second column from the right reflects the uniform rate of progress glidepath for each area; and the furthest column to the right reflects the uniform rate of progress glidepath "adjusted" to take into account international emissions and wildfire impacts. Class I areas where modeled visibility impairment exceeds the uniform rate of progress glidepath in either of the two last columns indicate that the area is *not* on the uniform rate of progress. West Virginia Plan, App. E-6: Future Year Model Projections at pdf 22 (Apr. 18, 2025) (EPA-R03-OAR-2025-0174-0020_content) ( JA_____).

[32] West Virginia's impact to each Class I area is reflected in app. E-7a to the West Virginia Plan. West Virginia Plan, App. E-7a, Attach. A – PSAT Tagging Results (Apr. 18, 2025) (EPA-R03-OAR-2025-0174-0024_content) (JA_____) (on the "Area by Sector" tab, select the Class I areas from the dropdown menu with all species and all sectors selected).

42

B.    EPA unlawfully approved a West Virginia Plan that Failed to Fully Evaluate the Mandatory Statutory Factors for Sources "Subject To" Reasonable Progress.

In addition to failing to demonstrate that all affected Class I areas are on or below the uniform rate of progress, West Virginia arbitrarily and unlawfully refused to conduct reasonable four factor analyses for multiple facilities that the state concluded were subject to the Act's reasonable progress requirements. "[T]o select sources having the largest contribution to visibility impairment, and thus, [having the] greatest opportunity for reasonable progress improvement," West Virginia conducted a multi-step modeling analysis to identify sources "for reasonable progress analysis." West Virginia Plan at 181, 189 (JA____,__). In short, "all facilities with a greater than or equal to 1.00%" contribution to sulfate or nitrate impairment in affected Class I areas "were examined for reasonable progress." *Id.* at 181 (JA____). Specifically, the state selected six coal-burning power plants—Harrison, Fort Martin, Mitchell, John E Amos Grant Town Plant, and Pleasants—"for reasonable progress analysis." *Id.* at 189, tbl. 7-32 (JA____) ("Facilities in West Virginia Selected for Reasonable Progress Analysis").

Having concluded that each of those facilities contributed to visibility impairment in affected Class I areas—*i.e.*, subject to a reasonable progress analysis (*id.*)—West Virginia was required to evaluate pollution control measures for each source, based on a consideration of the four statutory factors and in accordance

43

with the haze rule and EPA guidance. Instead, West Virginia arbitrarily and summarily refused to evaluate the four statutory factors for Grant Town. West Virginia Plan at 197–8. And although the state requested that four of the facilities (Harrison, Fort Martin, Mitchell, and Amos) submit their own formal four factor control analyses, each facility refused. *See generally id.* at 196, apps. G-1, G-2 (JA____,__). The state then failed to conduct a reasonable four factor analysis, in accordance with the Regional Haze Rule and EPA guidance, for any of these facilities. That failure is not a harmless error. As discussed in detail below, the record demonstrates that there are additional control measures for each facility that would be technically and economically feasible, and which would result in significant pollution reductions.

EPA does not dispute that West Virginia failed to conduct comprehensive four factor analyses for the sources that the state identified for reasonable progress. Instead, EPA asserts that such an analysis is not required because the Act does not require states to evaluate reasonable progress for "all individual sources." RTC at 35 (JA____). EPA further contends that "there is no direct connection between the statutory requirement to consider the remaining useful life of 'any existing source'" under 42 U.S.C. § 7491(g)(1), and the "separate statutory requirement" under 42 U.S.C. § 7491(b)(2), for each SIP to include emission limits "as may be necessary to make reasonable progress." RTC at 37 (JA____). According to EPA,

44

42 U.S.C. § 7491(g)(1)'s reference to "any existing source" only applies to the consideration of sources that "may become subject to emissions control requirements as part of a determination of reasonable progress." *Id*. That interpretation is contrary to the plain language of the Act, which requires that "*each*" haze SIP include "emission limits, schedules of compliance and other measures as may be necessary to make *reasonable progress*." 42 U.S.C. § 7491(b)(2) (emphasis added).

Although states have "discretion" in selecting particular sources for further analysis, once the state determines that an existing source is subject to the reasonable progress requirements of the Act, the state must evaluate potential control measures, based on a reasoned consideration of the four statutory factors. 42 U.S.C. §§ 7491(b)(2), (g)(1); 40 C.F.R. § 51.308(f)(2)(i). EPA's Guidance, in turn, sets out a detailed, iterative process for conducting any such "four factor analysis," which requires the state to consider the "*full range* of potentially reasonable options for reducing emissions." EPA Clarification Memo at 7 (JA____) (emphasis added); *see also* Memo. from Peter Tsirigotis, Director, to Regional Air Division Directors on Guidance on Regional Haze State Implementation Plans for the Second Implementation Period at 29 (Aug. 20, 2019) ("EPA 2019 Guidance") (JA____). EPA's guidance and past practice makes clear that, while states have some discretion in determining which emission control

45

measures to consider, the state must consider a reasonable range of measures, including upgrades and efficiency improvements for existing controls, work practice improvements, and the use of lower sulfur fuel. *Id*.; *see also* 82 Fed. Reg. at 3088 (noting EPA's disapproval of past haze plans for failing to consider highly cost-effective pollution control "upgrades"). The state must then the evaluate and document the capital and operational costs of the full range of new or upgraded control options by evaluating the cost per ton of pollution reduced annually; evaluating the time necessary to engineer and install such controls; characterizing any energy or non-air constraints associated with such controls; and finally, evaluating the remaining useful life of the source, which may affect cost of controls. *See generally* EPA 2019 Guidance at 28–42 (JA____-__).

Here, West Virginia failed to reasonably evaluate the four statutory reasonable progress factors for the facilities that the state identified as being subject to reasonable progress. Specifically, and as discussed in further detail below, West Virginia refused to evaluate the "full range" of potential emission reduction measures, including improvements to those facilities' *existing* flue gas desulfurization systems. *See also* West Virginia Plan, App. H-2 at pdf 17–38, (JA____-__) (National Park Service's recommendations to fully evaluate cost-effective improvements to existing controls at West Virginia power plants). Instead, West Virginia evaluated "only" one pollution control option for each of

46

the six coal plants subject to reasonable progress: replacement of their existing sulfur dioxide pollution controls with brand "new scrubbers," at a cost of between $648 million to $1.44 billion per facility. *Id.* at 202–3 (JA ____-__). Moreover, given the age of the six facilities (ranging from 29 to 55 years old), West Virginia also assumed shortened remaining useful lives for each of the facilities (ranging from one to fifteen years). *Id.* at 205 (JA____). As a result, the cost per ton of pollution removed (EPA's standard metric for determining cost-effectiveness) associated with replacing each scrubber system was exorbitantly high. In other words, rather than conducting a reasonable four factor analysis of the "full range" of available control options, including relatively inexpensive efficiency improvements, West Virginia conducted a myopic evaluation of *only* the most expensive option available. That approach is contrary to the Regional Haze Rule and EPA guidance and cannot be characterized as satisfying EPA's new uniform rate of progress policy.

## V. West Virginia's Evaluation of Control Options was Flawed and Arbitrary.

Even if it was reasonable for West Virginia to evaluate "only" the most expensive control option for the largest sources of haze pollution in the state (it was not), the state's analysis was flawed in numerous ways. Moreover, the record demonstrates that there are low-cost, common-sense improvements to the West

Virginia power plants' existing pollution control systems that could result in significant pollution benefits.

A.   West Virginia's Evaluation of New Scrubbers is Flawed.

West Virginia calculated the cost of replacing existing sulfur dioxide controls with new scrubbers at six facilities: Harrison, Fort Martin, Mitchell, Amos, Grant Town and Pleasants. West Virginia's evaluation was flawed for several reasons. First, to conduct its evaluation, West Virginia estimated the cost per potential ton of emission reduction for each unit based on an anticipated retirement date. *See* 90 Fed. Reg. at 6949. Yet West Virginia did not provide "any evidence that the described retirement dates for any of the six facilities" are "federally enforceable and permanent." *Id*. As EPA found in its proposed disapproval, West Virginia did not provide "sufficient evidence" that it was reasonable to use "a shorter remaining useful life within its cost estimates." *Id*.

Second, as also acknowledged by EPA's proposed disapproval, West Virginia's cost estimates "are insufficiently justified," as the state did "not provide any evidence supporting how it established those costs" or explained "the origin of such information including its underlying calculations or documentation." *Id*. at 6950.

Finally, and as further described below, replacing existing sulfur dioxide controls with new scrubbers (particularly scrubbers that use "the best technology

48

with the highest $SO_2$ removal efficiency of all coal and acid gas control technologies," West Virginia Plan at 202 (JA____)) is not the single option available for West Virginia sources. Rather, as EPA's proposed disapproval found, West Virginia should have evaluated potential additional measures, including "optimization of existing controls." 90 Fed. Reg. at 6950. The record shows that improvements to existing controls can be cost-effective and yield significant sulfur dioxide reductions;[33] yet, West Virginia did not consider any of them.

<blockquote>

B.   <u>West Virginia Arbitrarily Failed to Evaluate Cost-Effective Efficiency Improvements.</u>
</blockquote>

<u>B.1.  Harrison</u>

EPA approved West Virginia's determination that, for Harrison—the top polluting facility in West Virginia—no additional or improvements to existing controls are necessary to make reasonable progress, even though neither the State nor EPA provided a rational basis for skipping the required evaluation of pollution controls. Instead of conducting a four factor analysis for this facility, West Virginia accepted the plant owner's (MonPower's) claim that additional controls were "neither necessary nor economically feasible."[34]

---

[33] *See* Table 1 above.

[34] *See* Letter from James Meade to West Virginia, Monongahela Power Harrison Power Station Regional Haze Rule Compliance (Feb. 1, 2021) (JA____); West Virginia Plan, App. G-2: Reasonable Progress Evaluation/Long-Term Strategy (JA____).

But again, EPA's own guidance makes clear that even sources with existing controls must still be evaluated for potential upgrades, which are often cost-effective and necessary to ensure reasonable progress. 82 Fed. Reg. at 3088 (explaining that Texas' analysis was in part rejected because it did not properly consider EGU scrubber upgrades); *see also* 70 Fed. Reg. 39,104, 39,171 (Jul. 6, 2005) ("For those BART-eligible EGUs with preexisting post-combustion $SO_2$ controls achieving removal efficiencies of at least 50 percent, your BART determination should consider cost effective scrubber upgrades designed to improve the system's overall $SO_2$ removal efficiency.").

Here, the record shows that the Harrison "scrubber systems have demonstrated the ability to meet or come close to" the 98% control efficiency that EPA considers optimal. Kordzi 2025 Report at 16 (JA____). However, Harrison has only achieved this level of performance "sporadically." *Id*. Indeed, Harrison's sulfur dioxide emissions "show a clear trend of increasing over time," "reflected by the gradually worsening performance of the scrubber systems for these units." *Id.* at 24 (JA____). Thus, a proper four factor analysis "would likely result in the conclusion that these scrubber systems can be optimized." *Id.* at 25; *see also* West Virginia Plan, App. H-2 at pdf 24–6 (JA____-__) (Nat'l Park Serv. recommending the same).

50

Finally, EPA has not grappled with its own prior rationales. As EPA acknowledged in its January proposed disapproval, West Virginia merely restated MonPower's justifications without conducting its own review. 90 Fed. Reg. at 6944. In its proposed disapproval, EPA also identified Harrison's lack of a four factor analysis, reliance on inadequate documentation, and failure to evaluate cost-effective controls as violations of the Act and Regional Haze Rule. 90 Fed. Reg. at 6946.

### B.2.  Fort Martin

As with Harrison, EPA approved West Virginia's determination that no additional emission reduction measures are necessary to make reasonable progress for Fort Martin even though neither the State nor EPA conducted the required four factor analysis. West Virginia merely noted the facility's refusal to submit the analysis, summarized its flawed responses to its request for a formal four factor analysis, and seemingly accepted MonPower's contention that additional controls "would be neither necessary nor economically feasible at Fort Martin." West Virginia Plan at 197 (JA____).

Nevertheless, Fort Martin Unit 2's sulfur dioxide emissions have trended upward, which is a reflection of how that scrubber system is operated and indicates that cost-effective upgrades are likely available. Joe Kordzi, A Review of the West Virginia Regional Haze State Implementation Plan at 37 (Dec. 2021) (EPA-R03-

51

OAR-2025-0174-0072_attachment_4 ) (JA____) ("Kordzi 2021 Report"). The record also shows that Fort Martin's sulfur dioxide emissions "have been erratic over time" and, had the scrubber systems "been operating at the optimized 98% efficiency level, approximately 2,500 tons of $SO_2$ would not have been emitted over the last five years alone." Kordzi 2025 Report at 27–8 (JA____-__); *see also* West Virginia Plan, App. H-2 at pdf 22–3, (JA____-__) (Nat'l Park Serv. recommending the state evaluate improvements to existing controls).

### B.3.  Mitchell

KPCo, the owner of the Mitchell Power Plant, took the same approach as MonPower: it told West Virginia that Mitchell's emissions were "well ahead of the uniform rate of progress goals," 90 Fed. Reg. at 6945, and therefore no further evaluation or additional sulfur dioxide controls were needed. Instead of conducting its own full four factor analysis, West Virginia accepted KPCo's claims and merely summarized the company's responses. 90 Fed. Reg. at 6944. In its proposed disapproval of the West Virginia Plan, EPA asserted that West Virginia wrongly relied on consent decrees, which were not federally enforceable as part of the state's plan, to excuse it from conducting a four factor analysis. 90 Fed. Reg. at 6947. EPA's approval in the Final Rule does not provide any justification for its current change in position. Moreover, as the National Park Service recognized, there is a "significant amount of variability" in the efficiency of Mitchell's existing

52

pollution controls, and the state should have evaluated measures to ensure that SO2 emissions were "consistently low." West Virginia Plan, App. H-2 at pdf 33, (JA____). West Virginia ignored that recommendation. *Id*. at pdf 96.

### B.4.  Amos

At Amos, a modest 1–2% improvement would result in significant sulfur dioxide reductions. Kordzi 2021 Report at 47 (JA____). Indeed, "[h]ad these units continuously met the 98% optimization target, approximately an additional 7,000 tons of SO2 would not have been emitted over the last five years alone." Kordzi 2025 Report at 30 (JA____); *see also* West Virginia Plan, App. H-2 at pdf 26 (JA____) (Nat'l Park Serv. recommending evaluation of pollution control improvements). West Virginia ignored those potential improvements, asserting that efficiency improvements were infeasible without documentation and without conducting a Four Factor Analysis. *Id*. At pdf 89. EPA correctly recognized in its January proposed disapproval that West Virginia's rejection of additional controls for Amos "is not based on consideration of the mandatory four factors and instead appears to be based, at least in part, on the facility owners' contention that these facilities are effectively controlled via existing measures." 90 Fed. Reg. at 6945–6. EPA acted arbitrarily by later approving that same unsupported conclusion in its Final Rule.

### B.5.  Grant Town

53

Although West Virginia selected Grant Town for a reasonable progress evaluation, it did not request a four factor analysis based on a permit limit for sulfur dioxide. 90 Fed. Reg. at 6943. West Virginia also claimed that the remaining lifespan of Grant Town Power Plant is thirteen years, or until 2035, and unilaterally concluded that additional sulfur dioxide controls would not be economically feasible. *Id.* at 6945. Yet excluding Grant Town from a four factor analysis simply because it is expected to retire at some point in the future is improper. As EPA's proposed disapproval noted, West Virginia did not provide "sufficient evidence within its SIP submittal that" Grant Town's "retirement date[ is] federally enforceable", thus EPA could not lawfully rely on that speculative date to excuse the State from performing the required analysis. *Id.* at 6949.

As the record shows, Grant Town "does have the ability to alter the amount of limestone to its CFB boilers, which could potentially be increased in order to provide more SO2 control." Kordzi 2025 Report at 19 (JA____); *see also* West Virginia Plan, App. H-2 at pdf 29–30 (JA____-__) (same). EPA has offered no new evidence or analysis that would justify abandoning its prior conclusion that West Virginia was required to conduct a four factor analysis for Grant Town.

B.6.  Pleasants

Only Pleasants submitted a four factor analysis to West Virginia. Pleasants considered three precombustion and five post-combustion sulfur dioxide emissions

54

controls, and eliminated all potential control options, aside from low-sulfur fuel, as technologically infeasible. West Virginia Plan at 199 (JA\_\_\_\_); *see also* 90 Fed. Reg. 6947–8. EPA's original review of Pleasants' four factor analysis correctly indicated that the controls dismissed as technically infeasible "should have been monetized in a four factor analysis," Kordzi 2025 Report at 32 (JA\_\_\_\_), and "those modifications are not described in sufficient detail for the EPA to be able to evaluate whether these options are, in fact, technologically infeasible." 90 Fed. Reg. at 6948. The record shows that "the scrubber system for [Pleasants] have always performed suboptimally and this level of performance degraded even more in the past year," and indicates that had these scrubber systems operated at their 98% optimal rate, almost 30,000 tons of $SO_2$ would not have been emitted over the last five years alone." Kordzi 2025 Report at 33–4 (JA\_\_\_\_); *see also* West Virginia Plan, App. H-2 at pdf 18–21 (JA\_\_\_\_-\_\_) (Nat'l Park Serv. noting variability in $SO_2$ emissions and recommending the evaluation of efficiency improvements).

While West Virginia claimed that it relied on Pleasants' potential retirement as part of its analysis, EPA correctly explained in its January proposed disapproval that for "retirements/shutdowns [to] be considered as part of West Virginia's long-term strategy for making progress towards the national goal," these must be "permanent[,] federally enforceable and[] included in the SIP." 90 Fed. Reg. at

55

6949. EPA found that West Virginia had not requested that the shutdown "be included as a permanent and federally enforceable measure", nor provided documentation of the shutdown. *Id*. EPA's approval of the West Virginia Plan without addressing these unresolved deficiencies at Pleasants Power Station underscores that the agency failed to provide a rational explanation for its reversal and was arbitrary.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, this Court should vacate EPA's approval of the West Virginia Plan and remand this matter to EPA for further proceedings.

Dated: January 28, 2026                    Respectfully submitted,

**s/ Charles McPhedran**
Charles McPhedran
Pa. Bar ID No. 60123
Earthjustice
1617 John F. Kennedy Blvd., Suite
2020 Philadelphia, PA 19103
(215) 717-4521
cmcphedran@earthjustice.org

*Counsel for Petitioners National Parks Conversation Association and Sierra Club*

Joshua D. Smith
Ore. Bar ID No. 071757
Sierra Club
2101 Webster St., #1300
Oakland, CA 94612
(415) 977-5560

56

joshua.smith@sierraclub.org

Isabella Ariza
DC Bar ID No. 90033154
Sierra Club
50 F. St. NW 8th Floor
Washington, DC 20001
(857) 999-6267
isabella.ariza@sierraclub.org

*Counsel for Petitioner Sierra Club*

57

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Proof Opening Brief of Petitioners National Parks Conservation Association and Sierra Club complies with the type-volume limits of Federal Rules of Appellate Procedure 32(a)(7)(B)(i) and 32(g)(1) because the brief contains 12,983 words, excluding portions of the brief exempted by Rule 32(f). The typeface and typestyle used comply with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because the brief was prepared using Microsoft Word in Times New Roman 14-point font.

Dated: January 28, 2026                    /s/ Charles McPhedran
                                           Charles McPhedran

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of January, 2026, I electronically filed the foregoing Proof Opening Brief of Petitioners National Parks Conservation Association and Sierra Club with the Clerk of the Court for the United States Courts of Appeals for the Fourth Circuit using the appellate CM/ECF system. I certify that all counsel of record are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: January 28, 2026                    /s/ Charles McPhedran
                                           Charles McPhedran