Case No. 25-2042

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

NATIONAL PARKS CONSERVATION ASSOCIATION and SIERRA CLUB,
Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, and LEE ZELDIN,
Administrator, U.S. Environmental Protection Agency,
Respondents,

and

STATE OF WEST VIRGINIA; WHEELING POWER COMPANY;
APPALACHIAN POWER COMPANY; KENTUCKY POWER COMPANY; and
MONONGAHELA POWER COMPANY,
Intervenors.

On Petition for Review of an Action of the U.S. Environmental Protection Agency

# PROOF RESPONSE BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY

Of Counsel:

Kaytrue Ting
Office of General Counsel
U.S. Environmental Protection Agency
Washington, D.C.

Jacobine Dru
Region 3 – Office of Regional Counsel
U.S. Environmental Protection Agency
Philadelphia, PA

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
ROBERT N. STANDER
Deputy Assistant Attorney General
Christine W. Ennis
Attorney
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 598-7342
christine.ennis@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

GLOSSARY ..... ix

INTRODUCTION ..... 1

STATEMENT OF THE ISSUES ..... 2

STATEMENT OF THE CASE ..... 3

I. Statutory and Regulatory Background ..... 3

A. Clean Air Act visibility protections ..... 5

B. Haze Rule and Revisions ..... 7

II. Procedural Background ..... 11

A. West Virginia's Plan ..... 11

B. EPA's Proposed Disapproval ..... 16

C. EPA's Proposed and Final Approval ..... 17

1. Proposed Rule ..... 18

a. EPA's new policy ..... 18

b. EPA determined that West Virginia reasonably considered the four statutory factors ..... 20

c. EPA determined that visibility conditions at the affected parks would be below the URP in 2028 ..... 21

2. Final Rule ..... 24

SUMMARY OF ARGUMENT ....................25

STANDARD OF REVIEW ....................27

ARGUMENT ....................28

I. EPA's Policy Is Consistent with the Clean Air Act and the Haze Rule. 28

A. The Policy is a reasonable exercise of EPA's authority under the Clean Air Act. ....................29

B. EPA's Policy is consistent with the Haze Rule....................35

II. EPA Reasonably Approved West Virginia's Plan. ....................39

A. All parks affected by West Virginia emissions are at or below the URP....................39

B. West Virginia's plan considered the four statutory factors. ....................46

III. EPA Complied with Procedural Requirements in Announcing the Policy. ....................53

IV. If the Court Holds for NPCA, the Appropriate Remedy Is Remand without Vacatur. ....................57

CONCLUSION ....................58

CERTIFICATE OF COMPLIANCE ....................59

STATUTORY AND REGULATORY ADDENDUM ....................ADD-i

# TABLE OF AUTHORITIES

## Cases

*1000 Friends of Md. v. Browner*,
265 F.3d 216 (4th Cir. 2001) .......... 27, 28

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004) .......... 42

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
215 F.3d 61 (D.C. Cir. 2000) .......... 34

*Arizona ex rel Darwin v. EPA*,
815 F.3d 519 (9th Cir. 2016) .......... 32

*Arkansas v. Oklahoma*,
503 U.S. 91 (1992) .......... 28

*Balt. Gas & Elec. v. NRDC*,
462 U.S. 87 (1983) .......... 28

*Citizens Against Refinery's Effects, Inc. v. EPA*,
643 F.2d 178 (4th Cir. 1981) .......... 27

*Clean Wis. v. EPA*,
964 F.3d 1145 (2020) .......... 57

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 57

*Ergon-W. Va., Inc. v. EPA*,
980 F.3d 403 (4th Cir. 2020) .......... 27

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 32

*Food and Drug Admin. v. Wages & White Lion Invs.*,
604 U.S. 542 (2025) .......... 32

*George E. Warren Corp. v. EPA*,
159 F.3d 616 (D.C. Cir. 1998) ....................................................................34

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ............................................................................ 30, 31

*Md. Native Plant Soc'y v. U.S. Army Corps of Eng'rs*,
332 F. Supp. 2d 845 (D. Md. 2004) ...........................................................57

*Michigan v. EPA*,
576 U.S. 743 (2015) ....................................................................................30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ......................................................................................28

*New York v. EPA*,
443 F.3d 880 ...............................................................................................43

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
615 F.3d 291 (4th Cir. 2010) .........................................................................6

*NRDC v. EPA*,
571 F.3d 1245 (D.C. Cir. 2009) ..................................................................58

*Oklahoma v. EPA*,
723 F.3d 1201 (10th Cir. 2013) .......................................................... 6, 7, 32

*Reno v. Flores*,
507 U.S. 292 (1993) ............................................................................ 28, 58

*Sierra Club v. U.S. Army Corps of Eng'rs*,
909 F.3d 635 (4th Cir. 2018) .......................................................................57

*Tyson v. U.S. Dep't of Agric.*,
360 F. App'x 451 (4th Cir. 2010) .................................................................27

*Util. Air Regul. Grp. v. EPA*,
885 F.3d 714 (D.C. Cir. 2018) .....................................................................27

*Wall v. EPA*,
265 F.3d 426 (6th Cir. 2001) ....................................................................54

*Wisc. Dep't of Revenue v. Wrigley*,
505 U.S. 214 (1992)...............................................................................43

**Statutes**

42 U.S.C. § 7410 ........................................................................................7

42 U.S.C. § 7410(a)(2)..................................................................................7

42 U.S.C. § 7410(c) .....................................................................................7

42 U.S.C. § 7410(k)(3)..................................................................................7

42 U.S.C. § 7410(*l*) .....................................................................................7

42 U.S.C. § 7412(n)(1)(A) ..........................................................................30

42 U.S.C. § 7472(a) .....................................................................................4

42 U.S.C. § 7491 .........................................................................................18

42 U.S.C. § 7491(a) ....................................................................................29

42 U.S.C. § 7491(a)(1)......................................................................... 4, 32, 40

42 U.S.C. § 7491(a)(2)................................................................................29

42 U.S.C. § 7491(a)(3)................................................................................29

42 U.S.C. § 7491(a)(4)......................................................................... 5, 30, 31

42 U.S.C. § 7491(b) .....................................................................................5

42 U.S.C. § 7491(b)(1)................................................................................30

42 U.S.C. § 7491(b)(2)........................................... 30, 31, 34, 35, 44, 45, 46

42 U.S.C. § 7491(b)(2)(A) ........ 5, 45, 50

42 U.S.C. § 7491(b)(2)(B) ........ 6, 40

42 U.S.C. § 7491(d) ........ 51

42 U.S.C. § 7491(f) ........ 5

42 U.S.C. § 7491(g)(1) ........ 6, 30, 31, 34, 37, 46

42 U.S.C. § 7491(g)(2) ........ 50

42 U.S.C. § 7491(g)(6) ........ 4

42 U.S.C. § 7492 ........ 4

42 U.S.C. § 7492(b) ........ 4, 35

42 U.S.C. § 7492(e)(2) ........ 7

42 U.S.C. § 7607(d)(1)(J) ........ 27, 53, 56

42 U.S.C. § 7607(d)(3) ........ 53

42 U.S.C. § 7607(d)(4) ........ 53

42 U.S.C. § 7607(d)(5) ........ 53

42 U.S.C. § 7607(d)(9) ........ 27

**Regulations**

40 C.F.R. Part 56 ........ 53

40 C.F.R. Part 81 ........ 4

40 C.F.R. § 51.300(b) ........ 5, 44

40 C.F.R. § 51.308 ........ 7

40 C.F.R. § 51.308(d) ....7

40 C.F.R. § 51.308(f) ....36

40 C.F.R. § 51.308(f)(1) .... 8, 9, 36

40 C.F.R. § 51.308(f)(2) .... 7, 10, 36, 40, 45

40 C.F.R. § 51.308(f)(2)(i).... 9, 10, 36, 37, 47

40 C.F.R. § 51.308(f)(2)(i)(1)....10

40 C.F.R. § 51.308(f)(2)(i)(2)....10

40 C.F.R. § 51.308(f)(2)(i)(3)....10

40 C.F.R. § 51.308(f)(2)(i)(4)....10

40 C.F.R. § 51.308(f)(2)(ii) ....10

40 C.F.R. § 51.308(f)(2)(iii) ....10

40 C.F.R. § 51.308(f)(3) ....8

40 C.F.R. § 51.308(f)(3)(i)....10

40 C.F.R. § 51.308(f)(3)(ii) .... 8, 10, 36, 38, 41

40 C.F.R. § 51.308(i)(3)....51

40 C.F.R. § 52.2520(d) ....53

40 C.F.R. § 56.3(a)....53

40 C.F.R. § 56.5 ....55

40 C.F.R. § 56.5(a)(1).... 54, 55

40 C.F.R. § 56.5(a)(2).... 54, 56

40 C.F.R. § 56.5(a)(3) .......... 54

40 C.F.R. § 56.5(b) .......... 53, 54, 55

**Federal Register**

60 Fed. Reg. 62748 (Dec. 7, 1995) .......... 54

64 Fed. Reg. 35714 (July 1, 1999) .......... 7

70 Fed. Reg. 39104 (July 6, 2005) .......... 51

81 Fed. Reg. 296 (Jan. 5, 2016) .......... 51

82 Fed. Reg. 3078 (Jan. 10, 2017) .......... 4, 7, 8, 10, 19, 37, 38

90 Fed. Reg. 6932 (Jan. 21, 2025) .......... 16, 17, 39, 52

90 Fed. Reg. 16478 (Apr. 18, 2025) .......... 5, 6, 11, 12, 17, 18, 19, 20, 21, 22, 23, 24, 33, 40, 47, 52, 53, 54

90 Fed. Reg. 24008 (June 5, 2025) .......... 43

90 Fed. Reg. 29737 (July 7, 2025) .......... 11, 18, 24, 32, 33, 37, 38, 40, 42, 45, 49, 56

90 Fed. Reg. 57636 (Dec. 11, 2025) .......... 56

91 Fed. Reg. 3057 (Jan. 26, 2026) .......... 56

**Legislative History**

H.R. Rep. No. 95-564 (1977) .......... 19

## GLOSSARY

| | |
|---|---|
| EPA | Environmental Protection Agency |
| $SO_2$ | sulfur dioxide |
| $NO_x$ | nitrogen oxides |
| BART | Best Available Retrofit Technology |
| URP | Uniform Rate of Progress |
| RTC | Response to Comments |
| VISTAS | Visibility Improvement State and Tribal Association of the Southeast |
| NPCA | Petitioners National Parks Conservation Association and Sierra Club |
| WVSIP | West Virginia's State Implementation Plan |

## INTRODUCTION

The Clean Air Act directs states and EPA, through their combined efforts, to remedy manmade visibility impairment in certain national parks and wilderness areas and prevent future impairment. The Act recognizes that states have primary responsibility for controlling air pollution and requires EPA to establish a program for states to demonstrate reasonable progress toward the visibility goal. Under the Act, states have significant leeway to decide what, if any, pollution controls to impose on in-state sources for reasonable progress, as long as they consider four statutory factors. Visibility at federal parks has improved remarkably due in part to state efforts under the Act.

State plans must be submitted to EPA for review. EPA has broad authority to ensure that states comply with the visibility protection provisions. Under EPA's regulations, states must compare the improvement in visibility projected to result from their plans to a benchmark for the areas they affect. If the plan would not improve visibility to the same extent as the benchmark, the state must explain why further pollution controls are not necessary. Last year, EPA announced that going forward it will use this benchmark to streamline approval of state plans. EPA will now presume that the state adequately demonstrated reasonable progress if the plan meets or exceeds the benchmark for each affected park and meets the basic requirements of the Act by considering the four statutory

factors. This policy accounts for the text and structure of the statute and the visibility improvements that states have already achieved.

Petitioners National Parks Conservation Association and Sierra Club ("NPCA") challenge EPA's new policy and its approval of West Virginia's visibility plan pursuant to the new policy. Because EPA explained the basis for its new policy, which is consistent with the Act and existing regulations—including internal regulations to ensure that regional actions do not contradict nationwide policy—the Court should reject their challenge. Despite EPA's prior proposal to disapprove, EPA reasonably concluded that West Virginia's plan adequately considered the statutory factors and would ensure that visibility in affected parks makes reasonable progress toward the national goal.

## STATEMENT OF THE ISSUES

The Clean Air Act set a national goal of preventing future and remedying existing visibility impairment in certain national parks and wilderness areas. States must submit plans to EPA that contain measures "as may be necessary to make reasonable progress toward" the national goal. In developing these plans, states must consider four statutory factors. The issues presented are whether EPA's approval of West Virginia's plan should be upheld, where:

1. EPA reasonably relied in part on a new policy that, if relevant areas are on track to meet the national goal, treats state plans that consider the four

statutorily required factors as presumptively making reasonable progress toward the national goal;

2. EPA reasonably explained its basis for proposing and finalizing an approval of West Virginia's plan under the new policy and existing regulations after previously proposing to disapprove the plan;

3. West Virginia's plan fulfilled the Act's requirements because modeling showed that visibility in protected areas affected by pollution from West Virginia sources is on track to meet the national goal and because West Virginia considered the four statutory factors in determining reasonable progress;

4. EPA's announcement of its new policy in proposing to approve West Virginia's plan did not fall within the scope of, and therefore did not apply, agency regulations intended to promote consistency in EPA's actions; and

5. NPCA has not shown that vacatur is appropriate to address purported explanatory gaps in the approval or that the new policy cannot be lawfully applied to any qualifying plan.

## STATEMENT OF THE CASE

### I. Statutory and Regulatory Background

In 1977 and 1990, Congress amended the Clean Air Act to establish a national goal of preventing future and remedying existing visibility impairment in

protected national parks and wilderness areas ("parks").[1] 42 U.S.C. §§ 7491(a)(1), 7492. Specifically, Congress sought to remedy the visibility impairment from manmade air pollution. *Id*. § 7491(a)(1), (g)(6). Regional haze is visibility impairment produced by a multitude of sources and activities in a broad geographic area through emissions of particulate matter and its precursors. 82 Fed. Reg. 3078, 3081 (Jan. 10, 2017). Particulate matter may be comprised of sulfates, nitrates, and soil dust, among other things. *Id.* Relevant here, sulfur dioxide ("$SO_2$") is a precursor of sulfates; and nitrogen oxides ("$NO_X$") are a precursor to nitrates. These particles impair visibility by scattering and absorbing light, which reduces the clarity, color, and distance that one can see. *See id*.

Visibility impairment is measured in deciviews with lower values indicating clearer conditions. In the last fifty years, visibility conditions at parks have significantly improved due to the Act's visibility and other programs, including the national air quality standards for haze precursors. *See generally* 42 U.S.C. § 7492(b) (requiring that EPA account for visibility improvement from other air programs). For example, visual range on the most impaired days at the Dolly Sods Wilderness Area in West Virginia increased from about 14 miles in 2004 to about

[1] All large national parks, wilderness areas, and memorial areas over a certain size are deemed Class I areas. *See* 42 U.S.C. § 7472(a). Those Class I areas designated for visibility protections under Section 169A(a)(2) of the Act are found at 40 C.F.R. Part 81; for simplicity we refer to these herein as "parks."

45 miles in 2020, and is projected to increase to about 53 miles by 2028. *See* West Virginia State Implementation Plan ("WVSIP")_38, tbl. 2-6, App. E-6 at 17, tbl. 4-1, JA____, JA____.[2] *See also* 90 Fed. Reg. 16478, 16484 (Apr. 18, 2025) ("Proposal") (recognizing improvements in recent decades).

### A. Clean Air Act visibility protections

As directed by Congress, EPA promulgated regulations requiring that states submit implementation plans addressing visibility impairment ("plans"). 42 U.S.C. § 7491(a)(4), (b); *see* 40 C.F.R. § 51.300(b). These plans must contain "such emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress toward meeting the national goal."[3] 42 U.S.C. § 7491(b). Congress did not mandate what rate of progress is "reasonable" and provided no set deadline for achieving the national goal. *Id.* § 7491(f). Plans must include two features: First, a requirement to install the best available retrofit technology ("BART") at certain "major stationary sources" whose emissions "may reasonably be anticipated to cause or contribute to any impairment of visibility."[4] *Id.* § 7491(b)(2)(A). Second, plans must include a ten- to fifteen-year long-term

---

[2] For ease of understanding, we converted the reported deciview values to a unit of visual range expressed in miles.

[3] NPCA's description of this standard omits the phrase "as may be" in front of "necessary to make reasonable progress." Br. 4.

[4] West Virginia has no outstanding BART requirements.

strategy for making reasonable progress toward meeting the national goal. *Id.* § 7491(b)(2)(B).

The Act does not specify the criteria for a state's long-term strategy except that, "in determining reasonable progress there shall be taken into consideration" four factors:

> (1) costs of compliance;
>
> (2) time necessary for compliance;
>
> (3) energy and non-air quality environmental impacts of compliance; and
>
> (4) remaining useful life of any existing source subject to such requirements.

*Id.* § 7491(g)(1). Unlike the BART requirement, the Act does not dictate which sources to control under the long-term strategy after considering those factors. Thus, the outcome "may be either new, additional control measures for a source, or they may be the existing emission reduction measures that a source is already implementing." 90 Fed. Reg. at 16485.

Under the Act's "cooperative-federalism approach," *Oklahoma v. EPA*, 723 F.3d 1201, 1204 (10th Cir. 2013), states have the initial responsibility to determine the content of their plans to comply with the Act's visibility provisions. *See id.* at 1205, 1207-10. *See generally North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 298-99 (4th Cir. 2010) (describing cooperative federalism under the

Act). States must adopt their plans in a legally enforceable form after reasonable notice and a public hearing. 42 U.S.C. § 7410(a)(2). "States, however, exercise this authority with federal oversight." *Oklahoma*, 723 F.3d at 1204. EPA reviews each plan to determine compliance with the Act. 42 U.S.C. §§ 7410, 7492(e)(2). If EPA determines that a state's plan meets the Act's requirements, it must approve the plan. *See id*. § 7410(k)(3), (*l*).[5]

### B. Haze Rule and Revisions

In 1999, EPA promulgated the Haze Rule, 64 Fed. Reg. 35714 (July 1, 1999), 40 C.F.R. § 51.308. That rule created an iterative ten-year planning process that required states to submit plans to implement BART and a long-term strategy over a period from 2008 to 2018, 40 C.F.R. § 51.308(d), often referred to as the "first planning period." In 2017, EPA revised the Haze Rule to elaborate on the requirements for the long-term strategy and gave a deadline of July 31, 2021, for states to revise their long-term strategies for the "second planning period," which runs through 2028. *Id*. § 51.308(f)(2); 82 Fed. Reg. at 3080.

The Haze Rule introduced the concept of a Uniform Rate of Progress ("URP") for each park that states could use to assess their progress. *See* 64 Fed. Reg. at 35732. Starting from 2000 to 2004 baseline visibility conditions, the URP

---

[5] If EPA disapproves, EPA must promulgate its own plan for the state, unless the state corrects the deficiency. 42 U.S.C. § 7410(c).

is the linear rate of progress needed to attain natural visibility conditions in a park by 2064. 40 C.F.R. § 51.308(f)(1); *see also* WVSIP_41, Fig. 3-1, JA____ (reproduced below). EPA intended the URP to serve as a check on a state's work; if a state's plan[6] would not improve visibility at an affected park to a level at or below the URP, the Haze Rule requires a "robust demonstration" to show that no additional control measures were reasonably necessary. 40 C.F.R. § 51.308(f)(3)(ii). The URP is not a "safe harbor" for states that are below the URP to avoid consideration of the four statutory factors. *See* 82 Fed. Reg. at 3099.

[6] The numerical metric of projected visibility improvement in a park at the end of the planning period is called the "reasonable progress goal." 40 C.F.R. § 51.308(f)(3). We do not use that term to avoid confusion with the broader statutory requirement for reasonable progress toward the national goal.




The Haze Rule also provided an analytical framework for states to develop their long-term strategies. First, states must identify parks within their borders as well as those out-of-state parks where visibility may be affected by emissions from sources within the state. 40 C.F.R. § 51.308(f). Second, states must chart the URP for in-state parks. *Id*. § 51.308(f)(1). Third, states must determine which sources to evaluate for control measures and must describe the criteria used to select those sources. *Id*. § 51.308(f)(2)(i). The Haze Rule does not prescribe a particular method for identifying potentially affected parks or how to select sources for

evaluation, although EPA has provided states with guidance.[7] Fourth, states must evaluate potential emission reduction measures by considering the four statutory factors.[8] *Id*. Fifth, any measures determined to be necessary for reasonable progress must be incorporated into the state's long-term strategy. *Id*. § 51.308(f)(2).

Sixth, states must estimate (typically through modeling) the collective effects of their strategies, other Clean Air Act programs, and controls on sources located outside the state. *Id.* § 51.308(f)(3)(i). States must then compare the projected visibility impairment to the URP for each identified park to determine whether a further "robust demonstration" is required. *Id.* § 51.308(f)(3)(ii). Finally, states must consult on their plans with the federal land managers for the identified parks and with other states that contribute to the impairment at the identified parks. *Id*. § 51.308(f)(2)(ii), (i)(1)-(4). At any stage, states may rely on technical analyses developed by a regional planning process and approved by all state participants. *Id*. § 51.308(f)(2)(iii); 82 Fed. Reg. at 3082-83 (encouraging states to work with regional organizations).

---

[7] 2019 Guidance, EPA-R03-OAR-2025-0174-0046 at 8-10, JA____-____ (discouraging states from concluding that they affect no parks and also acknowledging that states are "not required to evaluate all sources of emissions" each period).

[8] NPCA's assertion that States must analyze the statutory four factors for *all* sources that may reasonably be anticipated to cause or contribute to any visibility impairment in *any* park is incorrect. Br. 5.

## II. Procedural Background

West Virginia submitted its plan for the second planning period on August 12, 2022. In April 2025, EPA withdrew an initial January 2025 proposal to disapprove the plan and instead proposed to approve it. *See* 90 Fed. Reg. at 16478. After notice and comment, EPA approved West Virginia's plan. Relying in part on a new policy, EPA concluded that West Virginia demonstrated reasonable progress without the need for additional controls because it considered the four statutory factors, and because the affected parks were projected to be below the URP. *See* 90 Fed. Reg. 29737, 29737 (July 7, 2025) ("Final Rule").

### A. West Virginia's Plan

To arrive at its long-term strategy, West Virginia identified baseline, current, and natural conditions at in-state parks; used data analysis and modeling to identify the in-state sources most responsible for visibility impairment from $SO_2$ and $NO_x$ emissions and the in-state and out-of-state parks they potentially affected; considered the four statutory factors in evaluating controls for those sources; compared the 2028 projected visibility impairment under its long-term strategy to the 2028 URP; and consulted with federal land managers and other states. *See* WVSIP_1-2, JA____-____. West Virginia relied on technical analyses by the regional planning organization Visibility Improvement State and Tribal Association of the Southeast ("VISTAS").

West Virginia identified nine parks with visibility impairment affected by in-state sources. Two of these, the Dolly Sods and Otter Creek Wilderness Areas are located in West Virginia; West Virginia therefore calculated the 2028 URP for these areas.[9] The out-of-state areas are: Acadia National Park (Maine), James River Face Wilderness Area (Virginia), Lye Brook Wilderness Area (Vermont), Moosehorn Wilderness Area (Maine), Roosevelt Campobello International Park (Maine), Shenandoah National Park (Virginia), and Swanquarter Wilderness Area (North Carolina). WVSIP_168, JA____.

Following the same approach as other VISTAS states, West Virginia analyzed data at parks to determine that $SO_2$ and $NO_x$ were the pollutants that contributed most to impairment in parks relevant to VISTAS states. WVSIP_27-28, JA____-____. In addition, $SO_2$ contributes most to visibility impairment in-state. WVSIP_49, JA____. West Virginia determined that individually identifiable sources emitting from fixed locations ("point sources") contributed the majority of $SO_2$. WVSIP_141-42, JA____- ____. Using data analysis to identify the likely sources contributing at least 0.2% of emissions affecting parks, West Virginia initially selected thirteen sources for more detailed tracking of their emissions using modeling. WVSIP_166, tbl. 7-17, JA____; *see* 2019 Guidance, EPA-R03-

---

[9] These parks have the same URP because they share an air monitor. *See* 90 Fed. Reg. at 16485.

OAR-2025-0174-0046 at 19, JA____ (approving use of such thresholds). The state next selected sources whose $SO_2$ and $NO_x$ emissions contributed at least one percent of the total point-source sulfate or nitrate impairment at affected parks for possible analysis by applying the four statutory factors. WVSIP_168-74, including tbls. 7-19 to 7-27, JA____- ____. West Virginia ruled out seven[10] of the thirteen sources tracked based on the one-percent contribution threshold and the state's qualitative weight-of-the-evidence approach (e.g., because the source's primary contribution was $NO_x$ instead of $SO_2$, or because the boilers that emit $SO_2$ had been shut down). WVSIP_182-87, JA____- ____. West Virginia conducted a reasonable progress analysis for coal- or coal-waste-fired electric generating units at six facilities: Harrison, Grant Town, Fort Martin, Pleasants, Mitchell, and John Amos. WVSIP_189, tbl. 7-32, JA____. West Virginia concluded that these sources contributed most to visibility impairment and therefore presented the greatest opportunity for emission reductions that would improve visibility at in-state and out-of-state parks. *See* WVSIP_181, JA____.

---

[10] Although West Virginia initially concluded that Grant Town was "not a significant contributor to visibility impairment," WVSIP_182, JA____, the state nonetheless selected it for reasonable progress analysis.

West Virginia then considered the four statutory factors[11]—cost, time necessary for compliance, non-air quality energy and environmental impacts, and remaining useful life of the source—and concluded that no additional measures were necessary. WVSIP_196-206, 211, JA____-____, JA____. From other Clean Air Act programs, five of the sources already have wet scrubbers (also known as Flue Gas Desulfurization) to reduce $SO_2$ emissions, WVSIP_197-99, 201, JA____-____, JA____; Grant Town, which is fired by coal waste and consists of two circulating fluidized bed boilers, captures and removes $SO_2$ by introducing limestone directly into the combustion area, WVSIP_197-98, JA____-____; and all are subject to regulation, WVSIP_197-202, App. G2-d at 48, JA____-____; JA____. Because wet scrubbers are the best $SO_2$ removal technology, West Virginia analyzed the cost of replacing the sources' existing scrubbers with newer limestone forced oxidation scrubbers so as to achieve 98% efficiency,[12] and the cost of installing such scrubbers for the first time at Grant Town. WVSIP_202-04, JA____-____. Even assuming a remaining useful life of 20 years (a "generous" lifespan for these older facilities), the resulting costs ranged from about \$5,000 to about \$122,500 per ton of $SO_2$ emission reduction. WVSIP_203, tbl. 7-37, JA____.

[11] NPCA inappropriately presents as fact its assessment that West Virginia did not consider the four factors. *See* Br. 10 (Table 1).

[12] Because John Amos was already operating at greater than 98% efficiency, this assumption resulted in a *decrease* in efficiency for that plant.

Additionally, the state observed that installing scrubbers would be "very energy intense" for Grant Town, and that other controls evaluated at Pleasants risked negatively affecting fine particulate matter emissions and would prevent Pleasants from recycling fly ash into a commercial product. WVSIP_204, JA____.

West Virginia also calculated the costs on a per unit basis, using each facility's estimated remaining useful life. These costs per ton of emissions reduced were considerably higher because the facilities' remaining useful lives were less than 20 years (e.g., fifteen years for boilers at Harrison; four for those at Fort Martin). WVSIP_204-05, tbl. 7-38, JA____-____. Even assuming replacement controls would be immediately operational, which is unrealistic for such a large project, WVSIP_204, JA____, estimated costs on a per unit basis ranged from about $7,250 to $204,000 per ton, WVSIP_205, tbl. 7-38, JA____. West Virginia reviewed seven additional control options for Pleasants but determined that only scrubbers were feasible. WVSIP_199-200, JA____-____. Applying the four statutory factors, West Virginia concluded that "the remaining useful life of Pleasants is not long enough to justify the high cost and lost revenue of install[ation]." WVSIP_200, JA____.

Ultimately, West Virginia's reasonable progress analysis "did not result in any further emission reductions beyond that quantified in the baseline 2028 modeling." WVSIP_211, JA____; *see also* WVSIP_130, tbl. 7-8, JA____.

However, West Virginia established that, even without additional control measures, the modeling showed that all affected parks would be at or below the URP in 2028. *See* WVSIP_132, fig. 7-9: Dolly Sods and Otter Creek, 133, fig. 7-10: VISTAS parks, 129, App. E-6 at 14-17, tbl. 4-1 including non-VISTAS parks, JA____, JA____, JA____.

### B. EPA's Proposed Disapproval

Initially, EPA proposed to disapprove West Virginia's plan based on concerns arising from certain requirements. *See* 90 Fed. Reg. 6932 (Jan. 21, 2025). The agency offered no criticisms of West Virginia's identification of parks or calculation of the URP, *see id*. at 6942 (noting that "EPA takes no position" on these analyses), and scant feedback on the state's source selection, *see id*. at 6944 (stating that "it is not clear" why West Virginia prioritized qualitative factors in excluding facilities with confirmed contributions to visibility impairment at parks).

EPA's proposal also expressed uncertainty as to whether West Virginia intended to rely upon reasoning included in the plan that the selected facilities were effectively controlled via existing measures, including where such reasoning was provided in the first instance by the facilities themselves. *Id*. at 6944-45. However, EPA noted that the state "reiterate[d] the facilities' reasons in detail and [did] not disavow their explanations." *Id.* at 6944. EPA considered the four-factor analysis for Pleasants as "not described in sufficient detail" for EPA to propose to confirm

the conclusion that the controls evaluated were technologically infeasible. *Id*. at 6948. For these reasons, and because EPA proposed to determine that West Virginia had not provided documentation to support its assertion that the existing measures relied upon to demonstrate reasonable progress were in place and enforceable, *id*. at 6946-47, EPA proposed that West Virginia had not performed a "full four-factor analysis," *id*. at 6944, and that its analysis was "inadequate," *id*. at 6950.

Reacting to statements by facility owners that no additional controls were required because impacted parks were below the URP, EPA reiterated that "reliance on being at or below the URP is not a basis to forgo requiring further analysis of emissions measures for these sources." *Id*. at 6947.

### C. EPA's Proposed and Final Approval

Following consideration of public comments on the proposed disapproval, EPA withdrew the proposed disapproval, announced a new policy for evaluating plans, and proposed to approve West Virginia's plan, in part, pursuant to that policy. 90 Fed. Reg. at 16478. EPA acknowledged and explained these changes and received comments from states and others.[13] After responding to comments,

[13] States commented for and against the policy. *See* EPA-R03-OAR-2025-0174-0056_(Utah), JA____; EPA-R03-OAR-2025-0174-0057_(Nebraska), JA____; EPA-R03-OAR-2025-0174-0060_(Alabama), JA____; EPA-R03-OAR-2025-0174-0064_(North Dakota), JA____. *Contra* Br. 26.

EPA finalized the new policy and its approval of West Virginia's plan. 90 Fed. Reg. at 29738, 29739-40.

### 1. Proposed Rule

#### a. EPA's new policy

In proposing to approve West Virginia's plan, EPA "announc[ed] that it is the Agency's new policy that, where visibility conditions for a park impacted by a state are below the URP and the state has considered the four statutory factors, the state will have presumptively demonstrated reasonable progress" ("Reasonable Progress Policy" or "Policy"). 90 Fed. Reg. at 16483; *see also id*. at 29738. EPA's Administrator described this "new commonsense approach" as "recognizing the significant improvement in visibility states have accomplished throughout the years." EPA, EPA Approves West Virginia's Regional Haze State Implementation Plan Utilizing New Commonsense Approach (July 1, 2025) ("Press Release"), https://www.epa.gov/newsreleases/epa-approves-west-virginias-regional-haze-state-implementation-plan-utilizing-new [https://perma.cc/2WAH-X9WQ].

EPA explained that the Policy aligns with the statutory purpose of achieving "reasonable," not maximal or immediate, progress toward Congress' national visibility goal. 90 Fed. Reg. at 16483. EPA elaborated that the change is also supported by the legislative history of the Act because "the term 'maximum feasible progress' in [42 U.S.C. § 7491] was changed to 'reasonable progress' in

the final version of the legislation passed by both chambers." Response to Comments ("RTC")_22, JA____ (citing H.R. Rep. No. 95-564, at 155 (1977) (Conf. Rep.)). The Policy also accounts for the "considerable improvements" to visibility that have already taken place. 90 Fed. Reg. at 16484. Commenters also supported this approach. *Id*. at 16483.

EPA acknowledged that this approach constituted a change regarding implementation of the Haze Rule. Under the Haze Rule, states assess the adequacy of their long-term strategies by comparing them to the URP to determine whether they need to make a further "robust demonstration." *See* 40 C.F.R. § 51.08(f)(3)(ii). In other words, if an affected park is above the URP, a state must do more for EPA to approve its plan. The Policy clarifies that if affected parks are below the URP, signifying that the state is on track to achieve the national visibility goal, then—as long as the state has taken the four statutory factors into consideration—EPA presumes that the state's long-term strategy is adequate. EPA explained that the Policy is consistent with the agency's admonition against using the URP to avoid considering the four statutory factors because the Policy does not relieve states of that statutory obligation. *See* 90 Fed. Reg. at 16484 (citing 82 Fed. Reg. at 3099).

#### b. EPA determined that West Virginia reasonably considered the four statutory factors

In the Proposal, EPA described how West Virginia had documented its selection of six facilities for the four-factor analysis. *See id*. at 16486. EPA noted that West Virginia had shown that these sources, which contribute to visibility impairment in the Dolly Sods and Otter Creek Wildernesses, also affect seven additional parks out-of-state. *Id*.

Next, EPA explained how West Virginia considered the costs of additional controls, time to install, other energy and environmental impacts, and the remaining useful life of the source. EPA reported that the state "included cost analyses for replacing $SO_2$ controls at the six selected facilities" with new scrubbers operating at 98% control efficiency. *Id.* at 16486-87. EPA noted that West Virginia examined costs under two different scenarios: first, assuming a remaining useful life of 20 years for each source; second, by substituting the estimated remaining lifespan for each boiler, none of which had a full 20 years of remaining life, to estimate the replacement costs per unit. *Id*. at 16487. Because the six sources already had scrubbers operating at 90% efficiency or greater, the cost per ton of emissions reduced was relatively high. *See id*. (citing WVSIP_203, tbl. 7-37, JA____). In the second scenario, because of the estimated remaining useful life of the individual boilers, these calculations of costs per ton were even higher. *See id*. (citing WVSIP_205, tbl. 7-38, JA____). EPA cited West Virginia's

analysis, which further explains that operating new scrubbers would require an excessive amount of energy for Grant Town and could increase particulate matter emissions. *See id*. at 16487 n. 43 (citing WVSIP_204, JA____). EPA added that West Virginia had also included a "detailed four-factor analysis" of additional control technologies for Pleasants. *Id*.

EPA acknowledged that West Virginia had determined for all six sources that adding new controls would not be cost effective. *Id*. In addition, EPA noted all six sources "are already subject to many Federal and State air pollution regulatory programs," that the five coal-fired sources "are operating pursuant to the Cross-State Air Pollution Rule," which establishes a trading program for $SO_2$ emissions, and that Mitchell Plant was already subject to an $SO_2$ limit in the state implementation plan. *Id*. at 16486. Based on West Virginia's analysis, EPA proposed that the plan satisfied the statutory requirement because, "through consideration of the four statutory factors," the state had determined that it did "not need to include any additional measures in its long-term strategy." *Id*. at 16487.

#### c. EPA determined that visibility conditions at the affected parks would be below the URP in 2028

EPA also proposed to find that the "projected 2028 visibility conditions for [parks] influenced by emissions from West Virginia sources are all below the . . . URP." *Id*. at 16483. EPA compared the 2028 URP for the two parks in West Virginia—Dolly Sods and Otter Creek (DOSO)—to the state's long-term strategy

for each park and determined that "[a]ll West Virginia [parks] are projected to be below the 2028 URP." *Id*. at 16488. EPA also cited to the 2028 model projections and related appendix in West Virginia's plan, which showed that the other three impacted parks within VISTAS boundaries—James River Face (JARI), Shenandoah (SHEN), and Swanquarter (SWAN)—were projected to be below the 2028 URP. *See id*. at 16484 n.22 (citing WVSIP_130, tbl. 7-8, JA____, WVSIP_App. E-6 at 14-17, tbl. 4-1, JA____-____). *See also* WVSIP_132-33, including fig. 7-10, JA____-____.[14]




**Figure 7-10: Percent of URP in 2028**

[14] VISTAS supplied this figure for use by all its members, so it provides URP information about more parks than those that West Virginia identified as affected by West Virginia sources.

A negative percentage on the chart above indicates projected visibility in 2028 is better than the URP (i.e., below the URP); a positive percentage indicates that projected visibility in 2028 is worse than the URP (i.e., above the URP). WVSIP_132, JA____. West Virginia explained that "visibility improvements at all the VISTAS parks except the Everglades [EVER] are projected to be better than the uniform rate of progress," as demonstrated in Figure 7-10. *Id*.

EPA also cited data in West Virginia's plan showing that projected visibility in 2028 at the four out-of-state parks affected by West Virginia—Lye Brook (Vermont), Moosehorn, Roosevelt Campobello, and Acadia (Maine)—are also below their respective URPs. *See* 90 Fed. Reg. at 16484 n.22 (citing WVSIP_127-36, JA____-____, referencing WVSIP_App. E-6 at 14-17, tbl. 4-1, JA____-____). These results are further supported by EPA's modeling, which is also cited in West Virginia's plan. WVSIP_8, JA____, WVSIP_136 n.72, JA____; *see also* EPA, Availability of Modeling Data and Associated Technical Support Document for the EPA's Updated 2028 Visibility Air Quality Modeling 56, 60, 61 (Sept. 19, 2019) ("EPA Modeling"), https://www.epa.gov/sites/default/files/2019-10/documents/updated_2028_regional_haze_modeling-tsd-2019_0.pdf. EPA therefore proposed to find that "West Virginia has satisfied . . . applicable requirements," because "projected 2028 visibility conditions for both in-state and

out-of-state parks influenced by emissions from West Virginia sources are all below the URP." 90 Fed. Reg. at 16488.

Because parks impacted by West Virginia are below the URP, EPA proposed to approve West Virginia's long-term strategy, reasoning that "additional measures for West Virginia's long-term strategy are unnecessary for this planning period, particularly when there is no evidence . . . the impacted [parks] might deteriorate absent enforceable measures." *Id.* at 16487.

### 2. Final Rule

In the Final Rule, EPA "affirm[ed] that it is now the Agency's policy that, where visibility conditions for a [park] impacted by a state are below the URP and the State has considered the four statutory factors, the state will have presumptively demonstrated reasonable progress for the second planning period." 90 Fed. Reg. at 29738. EPA addressed comments on the Policy. *Id.* at 29739-40.

EPA further determined that West Virginia "took into consideration the four reasonable progress factors," as the Act requires, and that "[t]he [parks] impacted by emissions from W[est] V[irginia] are all below the URP." *Id.* at 29738. EPA addressed comments about whether West Virginia's plan satisfied the Policy. *Id.* at 29740. EPA ultimately concluded that, "as supported by the new policy, the State properly used the URP to inform its final decision making as to the measures necessary to make reasonable progress in the second planning period." *Id.*

## SUMMARY OF ARGUMENT

The Court should deny the petition for review because EPA lawfully approved West Virginia's plan.

1. EPA's Policy is a permissible exercise of EPA's authority and discretion under the Clean Air Act's visibility protection provisions and is consistent with the Haze Rule. To meet the national goal of preventing and remedying manmade visibility impairment in parks, the Act requires states to submit plans that include measures as may be necessary to make reasonable progress, which is evaluated by taking into consideration four statutory factors. EPA acted consistently with the statute's text and structure by presuming that a state's plan demonstrates reasonable progress if (a) parks affected by the state are on track to meet the national visibility goal, as determined by the URP and (b) the plan considered the four statutory factors. The Haze Rule uses the URP to inform whether state plans must do more to demonstrate reasonable progress, while the Policy uses the URP to inform whether state plans are sufficient. The Policy builds on and is consistent with the Haze Rule.

2. EPA changed its proposed action to approval based in part on its application of the Policy. As envisioned in the Policy, EPA evaluated West Virginia's plan in the context of the state's continuing success in meeting visibility goals so did not need to second-guess the state's consideration of the four statutory

factors. EPA therefore rationally reached a different conclusion than it had initially proposed.

3. EPA reasonably approved West Virginia's plan under the Policy. EPA found that West Virginia adequately described the criteria it used to identify parks affected by pollution from West Virginia sources, and that it demonstrated that these parks were projected to be at or below the URP by the end of the second planning period. EPA also found that West Virginia adequately described how it considered the four statutory factors for replacing scrubbers at six sources selected for reasonable progress analysis. Applying the Policy's presumption, EPA reasonably concluded that West Virginia had demonstrated compliance with its statutory and regulatory obligations and approved the plan.

4. EPA's Regional Consistency Regulations are designed to ensure that regional interpretations of the Clean Air Act and EPA's regulations are consistent with Agency policy and the actions of other EPA regions. These Regional Consistency Regulations do not apply to the Policy. Nor would their application have required meaningfully different process here, where EPA's headquarters and regional offices worked in close coordination. The Policy is consistent with both the Act and the Haze Rule and with the actions of other EPA regions since the Policy's announcement. Because EPA's action here neither promulgated nor

revised any visibility regulations, procedural requirements for the promulgation and revision of such regulations also do not apply.

5. Should the Court find error in the Final Rule, the appropriate remedy is remand without vacatur so that EPA may correct any identified deficiencies while avoiding the disruptive consequences of vacatur. Any remedy relating to EPA's approval of West Virginia's plan should not invalidate the Policy.

## STANDARD OF REVIEW

The Administrative Procedure Act's "highly deferential" standard of review applies. *Ergon-W. Va., Inc. v. EPA*, 980 F.3d 403, 410 (4th Cir. 2020).[15] The Court may set aside the Final Rule only if it is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens Against Refinery's Effects, Inc. v. EPA*, 643 F.2d 178, 181 (4th Cir. 1981). The Court decides if an agency's decision was arbitrary or capricious by determining if there has been "a clear error of judgment." *1000 Friends of Md. v. Browner*, 265 F.3d 216, 235 (4th Cir. 2001) (citation omitted). The court may not "substitute [its own] judgment for that of the agency." *Tyson v. U.S. Dep't of Agric.*, 360 F. App'x 451, 455 (4th

---

[15] Because EPA's New Policy and approval of West Virginia's plan neither promulgate nor revise visibility regulations, they do not trigger the identical standard of review under the Act. *See* 42 U.S.C. § 7607(d)(1)(J), (d)(9); *Util. Air Regul. Grp. v. EPA*, 885 F.3d 714, 718 (D.C. Cir. 2018).

Cir. 2010). When an agency "is making predictions, within its area of special expertise, at the frontiers of science . . . as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *1000 Friends*, 265 F.3d at 236-37 (quoting *Balt. Gas & Elec. v. NRDC*, 462 U.S. 87, 103 (1983)). While an "agency must examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made," this Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id*. at 238 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A court should also uphold an agency's factual determinations when they are supported by the administrative record, even if alternative findings could be supported by the record. *Arkansas v. Oklahoma*, 503 U.S. 91, 112-13 (1992).

To prove that an agency policy is facially invalid, a plaintiff must demonstrate that there is no set of circumstances in which the policy would be valid. *See Reno v. Flores*, 507 U.S. 292, 301 (1993).

## ARGUMENT

### I. EPA's Policy Is Consistent with the Clean Air Act and the Haze Rule.

The Clean Air Act's visibility provisions delineate a goal of preventing future and remedying existing manmade visibility impairment in parks. The Act specifies that EPA should require states to submit plans demonstrating reasonable

progress toward this goal, including by considering four statutory factors. EPA's Haze Rule fleshed out these requirements and established the URP as a benchmark against which states must assess their long-term strategies. EPA's Policy, which presumes that a state has demonstrated reasonable progress when it has considered the four statutory factors and when affected parks are on track to meet the national goal, is permissible under the Act and the Haze Rule.

### A. The Policy is a reasonable exercise of EPA's authority under the Clean Air Act.

The Clean Air Act gives EPA an important role in ensuring states' compliance with visibility protections and flexibility to determine how to do so, including by presuming compliance where a state considered the mandatory statutory factors and is on track to meet the national visibility goal. In Section 169A of the Act, Congress directed EPA to take various actions to provide most of the details for how to achieve the national visibility goal. *See* 42 U.S.C. § 7491(a). In consultation with the Secretary of the Interior, Congress directed EPA to "promulgate a list of [parks] in which he determines visibility is an important value." *Id.* § 7491(a)(2). Congress required EPA to study and report on methods for identifying and measuring visibility impairment, including contributions from manmade pollution and preventing and remedying such pollution. *Id.* § 7491(a)(3). Finally, Congress ordered EPA to promulgate regulations to assure "reasonable

progress toward meeting the national goal" and "compliance with the requirements of this section." *Id*. § 7491(a)(4).

Congress mandated two requirements for EPA's regulations. First, taking account of the recommendations included in its report to Congress, EPA must provide guidelines to states on appropriate techniques and methods for implementation. *Id*. § 7491(b)(1). Second, EPA must require each state plan "to contain such emission limits, schedules of compliance and other measures *as may be necessary* to make *reasonable progress* toward meeting the national goal." *Id*. § 7491(b)(2) (emphasis added). Plans must include BART, described *supra* page 5, and "a long-term (ten to fifteen years) strategy for making reasonable progress toward meeting the national goal." *Id*. § 7491(b)(1)-(2). Congress required that, "in determining reasonable progress there shall be *taken into consideration*" four statutory factors. *Id*. § 7491(g)(1) (emphasis added); *see supra* page 6 (identifying the factors).

Congress thus ordered EPA in subsection (a) to regulate subject to the limits outlined in subsection (b). With respect to the long-term strategy, these limits are described in terms and phrases that "leave[] agencies with flexibility." *Michigan v. EPA*, 576 U.S. 743, 752 (2015); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 396 n.6 (2024) (offering, as an example of such flexibility, Congress' direction to EPA in 42 U.S.C. § 7412(n)(1)(A) to regulate power plants "if the

Administrator finds such regulation is appropriate and necessary"). States must submit a visibility plan, but the statute establishes requirements qualitatively: plans must contain measures *as may be necessary* for *reasonable progress*. 42 U.S.C. § 7491(b)(2). Similarly, rather than specifying what standard or outcome would constitute reasonable progress, Congress named four factors that "shall be taken into consideration" in "determining reasonable progress." *Id*. § 7491(g)(1). The use of such terms authorizes EPA to exercise a degree of discretion in "assur[ing] . . . reasonable progress toward meeting the national goal." *Id*. § 7491(a)(4); *see*, *e.g.*, *Loper*, 603 U.S. at 394-95.

In particular, the requirement that the four statutory factors be "taken into consideration," does not describe what weight EPA should give to the state's decision-making once the state has considered these factors. 42 U.S.C. § 7491(g)(1). Indeed, the only statutory standard leaves room for EPA to exercise discretion in determining whether a state has included such "measures as may be necessary to make reasonable progress toward meeting the national goal."[16] *Id*. § 7491(b)(2). That goal, as defined by Congress, is to prevent future and remedy

---

[16] This requirement for reasonable progress does not mean that a state's plan must include all "reasonable" measures. *See* Br. 24. Instead, it must include measures "as may be necessary" after considering the four statutory factors. *See* 42 U.S.C. § 7491(b)(2), (g)(1).

existing visibility impairment in parks from manmade air pollution. *Id.* § 7491(a)(1).

EPA acted within these limits by announcing that it would afford states that considered the four statutory factors a presumption that they are making reasonable progress if the parks impacted by that state are on track towards the national visibility goal. Under the Administrative Procedure Act, an agency's change in policy is rational if it shows that "the new policy is permissible under the statute" and "there are good reasons for it." *FCC v. Fox Television Stations*, *Inc.*, 556 U.S. 502, 515 (2009); *see also Food and Drug Admin. v. Wages & White Lion Invs.*, 604 U.S. 542, 568-586 (2025). In general, "EPA may not disapprove reasonable state determinations that comply with the relevant statutory and regulatory requirements." *Arizona ex rel Darwin v. EPA*, 815 F.3d 519, 532 (9th Cir. 2016). Using the URP to give states the benefit of a presumption when they are already meeting or exceeding the rate of visibility improvement is in keeping with the "cooperative-federalism approach to regulat[ing] air quality." *See Oklahoma*, 723 F.3d at 1204. And while the policy "better aligns with the statutory goal" by recognizing the "considerable improvements" in visibility over recent decades, *see* 90 Fed. Reg. at 29738, it also does not foreclose EPA from disapproving a state plan that fails to meet statutory or regulatory requirements.

As an initial matter, NPCA fundamentally misrepresents the Policy in alleging that "states no longer have to engage with . . . requirements to identify emission reductions and compliance schedules in accordance with the four congressionally mandated statutory factors." Br. 38. The Agency clearly stated that the presumption requires that "the State has considered the four statutory factors." 90 Fed. Reg. at 16483; 90 Fed. Reg. at 29738 (same). As EPA explained, the "purpose of the long-term strategy is to make reasonable progress toward Congress' national goal." 90 Fed. Reg. at 16487. But where the state has considered the four factors and affected parks are below the URP, the Policy has the effect of streamlining EPA's review where it is most reasonable to do so because the state "has presumptively already made reasonable progress for the planning period." *Id.*

EPA disputes the notion that the Policy introduces a "fifth factor," or that consideration of the URP is inconsistent with the Act. *Contra* Br. 26. The Policy allows EPA to streamline its review of a state's plan based on a comparison to the URP—it does not require a state to consider additional factors. Even if treated as an additional factor, the mandate that four factors be "taken into consideration" in determining reasonable progress does not preclude consideration of the URP. Nothing in the definition or the statute suggests that such consideration must be exclusive. *See* Webster's Third New International Dictionary 484 (Philip B. Gove

ed., 1976) (defining "to take a matter into consideration" as giving it continuous or careful thought).

Courts are typically reluctant "to infer from congressional silence an intention to preclude the agency from considering factors other than those listed in a statute." *George E. Warren Corp. v. EPA*, 159 F.3d 616, 624 (D.C. Cir. 1998). Here, rather than define "reasonable progress" solely by the four factors, Congress explained that these factors were to be taken into consideration "in determining reasonable progress." *See* 42 U.S.C. § 7491(g)(1). Thus, Congress left little doubt that, while considering the four factors must be part of determining reasonable progress, it may not represent the entirety of that process. *See Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 77 (D.C. Cir. 2000) (concluding that a Clean Air Act provision requiring EPA to consider certain factors "in establishing criteria" required by the Act did not bar EPA from considering other factors).

Contrary to NPCA's argument, Br. 24-25, the Act does not require that each revision to the long-term strategy include additional controls. State plans need only include measures "as may be necessary to make reasonable progress toward meeting the national goal." 42 U.S.C. § 7491(b)(2); *see also* RTC_22, JA____ (explaining that Congress substituted "reasonable progress" for "maximum feasible progress" in the final version of the bill containing the Act's visibility

protections).[17] Given improving visibility conditions in most parks, a state could reasonably conclude both that no further emission control measures "may be necessary" and that it is making "reasonable progress toward the national goal." *See id.* The Act contemplates that there may be times when such measures are not "necessary"—for example, when visibility at affected parks is already improving at rates projected to meet the national goal. It also contemplates that other air pollution-control programs will contribute to visibility improvement. *See* 42 U.S.C. § 7492(b).

**B. EPA's Policy is consistent with the Haze Rule.**

EPA's Policy implements the Haze Rule and both incorporate the statutory requirement that states consider the four factors. They both use the URP in complementary ways to assess whether additional measures may be necessary to demonstrate reasonable progress. EPA's Policy governs how the Agency will review states' plans in furtherance of the Haze Rule; it neither changes nor contradicts states' obligations under that Rule. EPA's Policy is, therefore, consistent with the regulations.

The Haze Rule requires states to revise their long-term strategies for the second planning period, which runs through 2028, and outlines the components to

[17] NPCA's assertion that the Act's legislative history is "without merit," Br. 35, lacks sufficient detail for a response and should be treated as waived.

be included. 40 C.F.R. § 51.308(f). States must identify in-state parks and out-of-state parks where visibility is affected by the state's pollution. *Id*. States must create the URP for in-state parks. *Id*. § 51.308(f)(1). The Haze Rule requires states to determine which in-state sources to evaluate and, echoing the statutory requirement, to consider the four factors in evaluating these sources for potential emission reduction measures. *Id*. § 51.308(f)(2)(i). State plans must include a description of "how the four factors were taken into consideration in selecting the measures for inclusion." *Id*. These measures are incorporated into the state's long-term strategy. *Id*. § 51.308(f)(2). The Haze Rule next requires that states use the URP for affected parks to assess their long-term strategies. Where visibility under the strategy is projected to be worse in 2028 than the benchmark established by the 2028 URP (i.e., above the URP), states must include in their plan a robust demonstration that the measures therein constitute reasonable progress. *Id*. § 51.308(f)(3)(ii).

Whereas the Haze Rule sets forth the components a state is required to include in its long-term strategy, EPA's Policy explains how the Agency will review the long-term strategy in a state's plan for compliance with the Act and the Rule. If a state plan satisfies two prerequisites, EPA will presume that the long-term strategy demonstrates reasonable progress. First, as mandated by the statute and echoed in the Haze Rule, the Policy requires that "the State has considered the

four statutory factors." 90 Fed. Reg. at 29738 & n.2 (quoting 42 U.S.C. § 7491(g)(1)). Second, visibility under the state's long-term strategy must be projected at or better than the URP in 2028 (i.e., below the URP). *Id.*

Thus, the Haze Rule and the Policy both reaffirm the statutory requirements that state plans consider the four factors in evaluating potential emission controls and make reasonable progress toward the national goal.[18] In so doing, the Policy does not alter the regulatory requirement that state plans describe *how* the four factors were considered in selecting potential emission reduction measures. *See* 40 C.F.R. § 51.308(f)(2)(i). States must still engage in the analysis and make the submissions required by the Haze Rule. *See* 90 Fed. Reg. at 29739 ("Being below the URP does not relieve a State of its obligations . . . under the [Haze Rule].").

Likewise, EPA's Policy does not create a "safe harbor" that allows states to ignore or be exempted from considering the four statutory factors. *Contra* Br. 25, 30. NPCA quotes the 2017 Haze Rule's preamble for the proposition that failing to implement reasonable measures would be "antithetical" to the national visibility goal. Br. 25 (quoting 82 Fed. Reg. at 3094). But the touchstone is "reasonable" measures: EPA was considering whether a state that had identified certain measures as reasonable could walk them back once it determined that visibility at

---

[18] Because the New Policy upholds the same construction, it is immaterial whether the Haze Rule is regarded as a "contemporaneous construction" of the Act entitled to judicial respect. *See* Br. 29.

an affected park was already equivalent to or better than the URP. 82 Fed. Reg. at 3093. Then, as now, EPA explained that states should incorporate into their long-term strategies whatever measures they conclude may be necessary for reasonable progress after considering the four factors. *See id.* at 3093-94; 90 Fed. Reg. at 29739 ("Being below the URP does not relieve a State of its obligations under the [Act] and the [Haze Rule] to make reasonable progress."). This is true of a state's conclusion that no additional control measures are required as well—neither the Act, nor the Rule require that a state identify additional controls as necessary for reasonable progress with every planning period submission.

Contrary to NPCA's suggestion, Br. 30, the Haze Rule also does not prohibit consideration of "visibility conditions" in determining what emission reduction measures may be necessary for reasonable progress. In fact, the Rule requires states to compare the projected effect of the measures incorporated in their long-term strategy to the URP at affected parks. 40 C.F.R. § 51.308(f)(3)(ii). If those measures are projected to result in a slower rate of progress than the URP, a state must further demonstrate that no additional emission reduction measures would be reasonable to include in its long-term strategy. *Id*. Thus the Haze Rule already requires a state do more under some circumstances based on consideration of the URP. The Policy is consistent with that because it allows EPA to apply similar logic in reviewing a state's plan: to presume that a state that has considered the

four statutory factors has demonstrated reasonable progress if the long-term strategy would improve visibility fast enough to meet the national goal.

## II. EPA Reasonably Approved West Virginia's Plan.

After reviewing West Virginia's visibility plan under the Policy, EPA withdrew its prior proposed disapproval and proposed to approve the plan. In so doing, EPA explained that the change was based in part on the Policy. *See supra* pages 17-24. The Policy provides a rational basis for why EPA's conclusions in the Final Rule occasionally deviate from its preliminary assessment in the proposed disapproval. *Contra* Br. 51-55. As EPA explained, "final actions pre-dating the new policy implemented the URP differently." RTC_24, JA____. EPA rationally concluded that West Virginia had met its statutory and regulatory obligations to consider the four factors without insisting that the analysis be more fulsome. *See* 90 Fed. Reg. at 6944. For that reason, and because affected parks were already on track toward the national visibility goal, EPA approved the plan pursuant to the Policy.

### A. All parks affected by West Virginia emissions are at or below the URP.

EPA reasonably concluded that West Virginia satisfied the Policy's first prerequisite for presumption of reasonable progress. West Virginia complied with the statute and the Haze Rule in identifying nine impacted parks, creating the URP for the two parks located in-state, and comparing the URP for those two areas to

projected 2028 visibility under its long-term strategy. EPA's review of West Virginia's plan further demonstrated that "visibility conditions at all [parks] to which West Virginia contributes are below the URP." 90 Fed. Reg. at 16484.

Neither the Act nor the Haze Rule require states "to identify the precise set of [parks] that are affected by emissions from the State." 90 Fed. Reg. at 29740. Instead, the statute mandates that a state's long-term strategy make reasonable progress toward preventing and remedying anthropogenic visibility impairment at parks. *See* 42 U.S.C. § 7491(a)(1), (b)(2)(B). The Haze Rule requires that these long-term strategies address visibility impairment for each park "within the State" and "located outside the State that may be affected by emissions from the State." 40 C.F.R. § 51.308(f)(2). Although identifying these parks is nonetheless a logical first step in demonstrating reasonable progress toward eliminating manmade visibility impairment at these sites, the Act and the Haze Rule provide no instruction as to how states are to identify affected parks outside the state.

West Virginia reasonably identified parks relevant to its plan by modeling emissions from sources that the state found contributed to visibility impairment. In addition to two parks located in West Virginia (Dolly Sods and Otter Creek Wildernesses), which are easily discernable, West Virginia identified seven affected out-of-state parks. These areas—Shenandoah, James River Face, Swanquarter, Lye Brook, Acadia, Moosehorn, and Campobello—ranged from as

close as Virginia to as far away as Maine. *See* WVSIP_168, JA____. The state arrived at this list by using modeling to estimate the visibility impact of $SO_2$ and $NO_x$ emissions from thirteen West Virginia sources, *see* WVSIP_166, JA____, that the state had preliminarily screened as contributing to visibility impairment using data analysis, *see* WVSIP_146, JA____. From the modeling results, West Virginia identified the aforementioned seven parks as those where the West Virginia sources were "significantly impacting" visibility, as determined by $SO_2$ contributions of more than one percent. *See* WVSIP_168, JA____.

West Virginia created the URP for Dolly Sods and Otter Creek Wildernesses, WVSIP_41, fig. 3-1, JA____, and determined that projected visibility in 2028 at these areas would be below the URP, WVSIP_132-33, JA____-____. Data provided by West Virginia similarly showed that affected out-of-state parks were also projected to be below the URP in 2028. WVSIP_App. E-6 at 14-17, JA____. West Virginia therefore did not need to include in its plan a robust demonstration that no additional controls were necessary. *See* 40 C.F.R. § 51.308(f)(3)(ii). At each step, West Virginia supported its conclusions with textual explanation, data, and tables for illustration.

Considering the data West Virginia relied upon and its documented approach to identifying affected parks, EPA reasonably concluded that West Virginia's selection of parks was appropriate and that it had met its statutory and

regulatory obligations. *See* 90 Fed. Reg. at 29740; *see also Alaska Dep't of Envt'l Conservation v. EPA*, 540 U.S. 461, 485 (2004) (agreeing that EPA may not "second guess" reasoned, legally compliant state decisions). Likewise, although "the statute and rule do not require the contribution [to visibility impairment in out-of-state parks] to be 'significant,'" as West Virginia did, EPA concluded that "regardless, the state acknowledges that those identified out-of-state [parks] are affected by emissions from West Virginia." RTC_30, JA____; *see also* 90 Fed. Reg. at 29740 ("[T]here is no requirement to establish a source contribution threshold in identifying those areas."). EPA therefore justifiably found that West Virginia "reasonably documented the out-of-state [park] contributions, and they are not reasonably anticipated to cause or contribute to any impairment in any area that is above the URP." 90 Fed. Reg. at 29740.

To be sure, West Virginia's plan included information on other parks that the state did not identify as "affected" by West Virginia emissions. *See* WVSIP_133, fig. 7-10, JA____; *supra* page 22. But NPCA is incorrect that West Virginia thereby adopted all of these as its "affected" parks. *Contra* Br. 38. VISTAS provided this information for the use of all VISTAS states, and West Virginia was entitled to focus on the part that was relevant to its own analysis. *See* WVSIP_132-33, using Figure 7-10 for projected visibility at West Virginia parks, JA____-____. West Virginia ultimately determined that the VISTAS information

was both over- and under-inclusive: West Virginia did not identify several of the listed areas (Everglades, Caney Creek, Mingo, or Hercules Glades) as areas affected by West Virginia, and the VISTAS data did not include relevant parks in Vermont and Maine.

West Virginia also was not required to identify as affected all those parks to which its sources contributed less than one percent of $SO_2$, although NPCA argues that "West Virginia emissions do, in fact, affect those [parks]." Br. 42 (citing WVSIP_App. E-7a, Attach. A, JA____-____). EPA does not have a numerical standard for when a park is considered affected but, even if it did, that standard would not require including *any* non-zero contribution to visibility impairment. *See* RTC_31, JA____; *see, e.g.*, 90 Fed. Reg. 24008, 24012 (June 5, 2025) (disregarding contributions to visibility impairment below one percent in approving plan). The Act gives EPA "inherent power to overlook trifling matters."[19] *See New York v. EPA*, 443 F.3d 880, 888 (D.C. Cir. 2006) (internal citations eliminated). Here, VISTAS' modeling showed that West Virginia's contributions to other parks were close to zero. For example, West Virginia's contribution to light extinction at Dolly Sods (2.42 $Mm^{-1}$) is 2,420 times larger

[19] All statutes are deemed to accept this maxim absent contrary indication. Thus, the absence of a significance threshold in Section 169A(b)(2) and (b)(2)(B) is why plans may exclude those parks where states have a de minimis effect. *See New York*, 443 F.3d at 888 (quoting *Wisc. Dep't of Revenue v. Wrigley*, 505 U.S. 214 (1992)). *Contra* Br. 39-40.

than its contribution to Big Bend, and its contribution to the least-affected, out-of-state park it identified (Moosehorn) is 81 times larger (0.081Mm$^{-1}$). *See* WVSIP_App. E-7b, JA____.[20]

NPCA's primary argument to the contrary appears to be that, in identifying out-of-state parks, no contribution is negligible or de minimis, meaning that *every* state must analyze *all* parks in *every* submission. *See* Br. 38-39. That is not, and has never been, the law or EPA's practice. The Act does not establish a standard for identifying *parks* that states must address in their plan. The language that NPCA assumes dictates what parks state plans must address, Br. 39, in fact identifies which *states* must submit plans—i.e., those states that "may reasonably be anticipated to cause or contribute to any impairment of visibility in any [park],"[21] which EPA determined means all states must submit plans. 42 U.S.C. § 7491(b)(2); 40 C.F.R. § 51.300(b). The Act's only requirement for state visibility plans is that they include "measures as may be necessary to make reasonable progress toward meeting the national goal." 42 U.S.C. § 7491(b)(2). Instead, EPA requires in the Haze Rule that states' long-term strategies address "each [. . . park]

---

[20] These numbers are reported in inverse megameters (Mm$^{-1}$), which is another measure of visibility.

[21] That this language does not describe the criteria to be included in a state's plan does not render it "superfluous," Br. 39, because it already describes the criteria for when a state will be subject to the requirement to submit a visibility plan. *See* 42 U.S.C. § 7491(b)(2).

located outside the State that *may be affected* by emissions from the State," 40 C.F.R. § 51.308(f)(2) (emphasis added).[22] EPA's statement that West Virginia's emissions "are not reasonably anticipated to cause or contribute to any impairment in any area that is above the URP," 90 Fed. Reg. at 29740, while imprecise, explains that the state satisfied the first prerequisite of the Policy. EPA did not intend to articulate a new standard for identifying parks, *see id*. (reiterating that the Haze Rule requires states to address parks that "may be affected").

Finally, NPCA intimates that EPA found fault with West Virginia's identification of affected parks and its use of the URP. *See* Br. 38 ("EPA admits that West Virginia 'did not specifically identify all' of the out-of-state [parks] . . . ."); *id*. ("EPA further admits that . . . visibility in several [parks] affected by West Virginia emissions . . . are projected to be 'above the URP.'"). These quotes are taken out of context. In fact, EPA explained that West Virginia did *not* need to "specifically identify all" additional parks as affected by West Virginia emissions. *See* RTC_30, JA____ (noting only that these lists "provide[d] a reasonable set of [parks] for further consideration"). EPA remarked that the "only indication that some of these 24 [parks] may be above the URP is in Figure 7-10"; however,

---

[22] Indeed, if NPCA's standard for state plans in paragraph (b)(2) applied, it would render superfluous the requirement in paragraph (b)(2)(A) that BART be applied to sources "which may reasonably be anticipated to cause or contribute to any impairment of visibility in any [park]." *Id*. § 7491(b)(2), (b)(2)(A).

EPA's own modeling referenced in West Virginia's plan showed that these areas were projected to be below the URP. RTC_30-31 nn.4-5, JA____-____ (citing WVSIP_8, JA____, WVSIP_136 n.72, JA____, and EPA Modeling 56, 60, 61, *supra* page 23). At any rate, because West Virginia's identification of affected parks complied with the statute and the Haze Rule, it is not relevant whether other parks are projected to be above the URP, much less where URP data for these areas came from. *See* Br. 41.

**B. West Virginia's plan considered the four statutory factors.**

EPA also reasonably concluded that West Virginia satisfied the Policy's second prerequisite for presumption of reasonable progress. EPA determined that West Virginia acted within the scope of the statute and the Haze Rule by considering the four statutory factors in determining reasonable progress. EPA therefore approved West Virginia's plan on the basis that, under the Policy, West Virginia had presumptively demonstrated reasonable progress.

The Act requires that "each applicable implementation plan" include measures as may be necessary to make reasonable progress, assessed after considering the four factors. *See* 42 U.S.C. § 7491(b)(2), (g)(1). In considering the four factors, neither the Act nor the Haze Rule prescribe how states should identify the sources to be controlled, balance the factors, or establish a threshold level of control to apply after considering these factors. The Haze Rule requires that a state

"include in its implementation plan a description of the criteria it used to determine which sources or groups of sources it evaluated and how the four factors were taken into consideration in selecting the measures for inclusion in its long-term strategy." 40 C.F.R. § 51.308(f)(2)(i). The flexibility built into the four-factor analysis provide states with "bounded discretion" to identify approaches appropriate to their circumstances. *See* 90 Fed. Reg. at 16481.[23] As detailed *supra* page 12-13, West Virginia selected sources for reasonable progress analysis. NPCA does not take issue with the reasonableness of West Virginia's selection.

West Virginia's plan also demonstrated that it "took into consideration" the four statutory factors for these sources. The state analyzed replacing existing scrubbers with new scrubbers, which it determined was the best available technology. West Virginia considered two cases: one analysis that looked at the cost per facility, assuming a 20-year remaining useful life, and another evaluating the cost per unit (boiler), taking into account the estimated, facility-specific remaining useful life of each. Although cost was the factor given the greatest weight, West Virginia also considered time to install (it assumed for purposes of the analysis that the technology could be installed immediately), energy and non-

[23] Subsequent guidance by EPA provided more detailed suggestions for how states might undertake this analysis but is not binding. *See* 2019 Guidance, EPA-R03-OAR-2025-0174-0046 at 28-45, JA____-____; 2021 Guidance, EPA-R03-OAR-2025-0174-0048 at 6-12, JA____-____.

air quality environmental impacts (noting in particular that replacement technology would be energy intense for the smallest source; and that the technology risked turning a useful byproduct into waste), and the source's or unit's remaining useful life. *See* WVSIP_196-206, including tbls. 7-37 to 7-38, JA____. West Virginia determined that, even under the lower-cost first case, the four-factor analysis suggested that replacing the scrubbers was not cost-effective, and West Virginia decided no additional controls were necessary. *See* WVSIP_211, JA____.[24]

For Pleasants, West Virginia additionally considered three pre-combustion and four new post-combustion emission controls. WVSIP_199, JA____. Nonetheless, the State determined that since scrubbers were already installed at the plant, replacement scrubbers were the only feasible option in light of their $SO_2$ removal efficiency and the various non-air and energy impacts, and higher capital, operation, and maintenance costs of the other controls. WVSIP_199-200, JA____-____. As it had with the other sources, West Virginia concluded that the remaining useful life of the plant was too short to justify the high costs and lost revenue of replacing the scrubbers. *Id.*

---

[24] NPCA's assertion that West Virginia "summarily refused to evaluate the four statutory factors for Grant Town," Br. 44, is hard to square with these cost estimates, which assume that time to install is immediate, are caveated by the energy effects for the facility, and assess remaining useful life at the source- and unit-level. *See* WVSIP_202-05, JA____-____.

Upon review, EPA reasonably concluded that West Virginia met its statutory and regulatory obligations because its "submittal demonstrated that the state took into consideration the four reasonable progress factors listed in [Clean Air Act] 169A(g)(1) with respect to an adequate number of emissions sources." 90 Fed. Reg. at 29738. EPA agreed with West Virginia's determination "that the specific sources selected for four-factor analyses were in compliance with already implemented emission control measures which continue to be successful, and that no additional $SO_2$ controls were necessary to make reasonable progress." *Id*. at 29740. Applying the presumption afforded by the Policy, EPA determined that West Virginia's plan demonstrated reasonable progress.

NPCA's arguments that West Virginia did not provide (1) evidence supporting how it established cost estimates, and (2) evidence that it was reasonable to use shorter remaining useful lifespan within its cost estimates, Br. 47-48, do not alter the reasonableness of West Virginia's analysis. West Virginia based its cost estimates on a reference document from EPA explaining how to calculate costs for scrubbers (among other emission controls);[25] historical calculated sulfur content and scrubber efficiencies from the U.S. Energy Information Administration; and historical emission data collected by EPA's Clean

[25] Documentation for Power Sector Modeling, EPA-R03-OAR-2025-0174-0077 at Attach. 5-3, JA____.

Air Markets Division. *See* WVSIP_202-206, JA____-____. And although West Virginia analyzed costs relative to what it deemed to be the "current expected remaining life of each unit" in its second case, WVSIP_204, JA____, the state initially assumed 20-year remaining useful life for each facility, WVSIP_202, JA____. West Virginia reasonably concluded the replacement technology was not cost-effective in either case. Because 20 years is well beyond when these sources are expected to retire, West Virginia also did not need to rely on retirement dates for Grant Town and Pleasants in determining reasonable progress. *Contra* Br. 54-56.

NPCA argues that West Virginia's consideration of the four factors was not reasonable, Br. 44, because the state did not study other, technically feasible control measures besides the most expensive, Br. 47-49. But neither the statute nor the Haze Rule required West Virginia to identify a particular source for reasonable progress analysis, assess a specific control measure, or give weight to the four statutory factors in any predetermined way. *Cf.* 42 U.S.C. § 7491(b)(2)(A), (g)(2) (identifying specific sources to evaluate for BART and that the five factors used to determine BART are to be applied "for the purpose of eliminating or reducing" the impairment caused by those sources). To the extent that EPA guidance suggests more specific considerations, *see* Br. 45-46, it is purely advisory as to the states and does not outweigh the presumption that EPA applied under the Policy.

Because the six sources that West Virginia selected had existing scrubbers or controls that were highly efficient at reducing $SO_2$ emissions—said to be above 97% at Harrison and Fort Martin, for example, *see* WVSIP_197-98, JA____-____—West Virginia reasonably focused on marginally increasing the efficiency of $SO_2$ removal at these sources. *See* WVSIP_202, JA____. Despite the cost, West Virginia determined that new scrubbers were best suited because they could increase efficiency to 98%. *Id*. That there may be other technically feasible control measures for each facility that West Virginia might have included does not render West Virginia's assessment unreasonable.[26]

NPCA also critiques West Virginia's consideration of the four statutory factors on other grounds, none of which has merit. First, NPCA asserts that, for all sources but Grant Town, the state did not evaluate controls suggested by federal land managers. Br. 50, 52-53, 55. West Virginia satisfied its obligations under Section 169A(d), 42 U.S.C. § 7491(d), and the Haze Rule, 40 C.F.R. § 51.308(i)(3), to consult with federal land managers, including the National Park Service, by providing a summary of their conclusions and recommendations before

---

[26] As evidence that sources must be evaluated for potential upgrades, NPCA cites two examples where EPA rejected state plans that failed to do so. Br. 50. These disapprovals, however, arose in scenarios where improved emission reduction efficiency was possible because the scrubbers were operating at only 50-70% efficiency. *See* 81 Fed. Reg. 296 (Jan. 5, 2016); 70 Fed. Reg. 39104, 39171 (July 6, 2005). Any increase in efficiency at the West Virginia sources will necessarily be more modest because they already operate at 90-98% efficiency.

public hearing and by describing in Appendix H-2 of the West Virginia plan how the state responded to their comments. *See* 90 Fed. Reg. at 16489. Neither the statute nor the Haze Rule requires West Virginia to adopt the National Park Service's recommendations.

Second, NPCA alleges that the state did not address comments that $SO_2$ emissions were increasing at Harrison, Fort Martin, and Pleasants. Br. 50-51, 55. EPA's approval of West Virginia's plan was reasonable, however, because the state was not required to evaluate additional emission controls based on comments that $SO_2$ emissions have increased or varied at some of its selected sources. Instead, West Virginia relied on the data in its plan to support its conclusions. Here, such data included statements from sources about their average $SO_2$ emissions from 2015 through 2020, *see, e.g.,* WVSIP_197-98, JA____-____, which were below the federal limit required for coal-fired power plants, *id*. (describing the Mercury Air Toxics Rule).

Third, NPCA cites EPA's proposed disapproval (which was never finalized and therefore never presented the agency's final view) in arguing that West Virginia failed to document whether the consent decrees that required installation of the existing scrubbers at Mitchell impose specific emission limits or whether such limits are federally enforceable. Br. 52 (citing 90 Fed. Reg. at 6947). EPA's approval of West Virginia's plan was reasonable, however, because West Virginia

determined that existing controls at Mitchell were adequate for reasonable progress, even without documentation of relevant consent decrees. The state based its decision, in part, on EPA's incorporation of $SO_2$ emission limits for Mitchell established by consent order into the Code of Federal Regulations—thereby making these limits federally enforceable. *See* 90 Fed. Reg. at 16486; 40 C.F.R. § 52.2520(d).

## III. EPA Complied with Procedural Requirements in Announcing the Policy.

Under EPA's Regional Consistency Regulations, 40 C.F.R. Part 56, an EPA regional office must seek concurrence from EPA headquarters before interpreting the Clean Air Act or a related rule in a way that may be inconsistent with Agency policy. *See id*. § 56.5(b). These rules are designed to ensure that EPA's ten regions apply the Act fairly and consistently. *Id*. § 56.3(a). In addition, the Act requires EPA to provide notice and an opportunity for public hearing and comment before promulgating final rules under the Act's visibility provisions. *See* 42 U.S.C. § 7607(d)(1)(J) & (d)(3)-(5). NPCA contends that the Reasonable Progress Policy is a regional interpretation that is inconsistent with Agency policy, and that EPA did not comply with the Regional Consistency Regulations or Clean Air Act Section 307(d). Br. 31-34. That is wrong and NPCA fails to identify any applicable requirements that were not followed or to show why any deviation would constitute prejudicial error warranting relief.

First, the Regional Consistency Regulations do not apply to the Policy that EPA announced in its action on West Virginia's plan. The Regional Consistency Regulations are designed to ensure that EPA's regions apply the Act consistently with Agency policy and with the actions of other EPA regions. 40 C.F.R. § 56.5(a)(1)-(3). They do not apply to changes in Agency policy—like the Reasonable Progress Policy—made at the national level.

In proposing the Policy, EPA made clear that EPA was announcing "the *Agency's* new policy," not that of the region. 90 Fed. Reg. at 16483 (emphasis added). This is true even though the Policy was announced as part of a state plan approval—a quintessentially local action—and was signed by the Acting Regional Administrator, Region 3. *See id.* at 16490. While changes in national policy and interpretation are often issued by EPA headquarters offices, those changes can also arise in the context of local actions issued by the Regions. *See*, *e.g.*, 60 Fed. Reg. 62748, 62750 (Dec. 7, 1995) (introducing and applying in the context of a state plan approval a changed national interpretation of statutory provisions on redesignation); *Wall v. EPA*, 265 F.3d 426, 439-40 (6th Cir. 2001) (upholding the same). Here, the EPA Administrator issued a press release to accompany the Final Rule, which further underscores that the Policy is national. *See* Press Release, *supra* page 18. Therefore, the requirement for concurrence from EPA headquarters, *see* 40 C.F.R. § 56.5(a)(1) & (b), did not apply.

NPCA borrows EPA's response to a comment on a different topic not at issue here—concerning whether the Agency needed to designate the rule as having "nationwide scope and effect" under Clean Air Act Section 307(b),[27] *see* RTC_26, JA____—and applies it out of context to conclude that EPA "admitted that the West Virginia final action . . . 'applie[d] a new policy' to West Virginia 'alone.'" Br. 33. EPA actually said that the action (not the Policy) is locally or regionally applicable "because [it] applies a new policy to a SIP submission from West Virginia alone." RTC_26, JA____. EPA's response to comments concerning the Regional Consistency Regulations are at RTC_20-21, JA____-____.

The Regional Consistency Regulations also do not apply because EPA Region 3's action announcing the Policy and approving West Virginia's plan establishes and is consistent with the national policy announced therein. This understanding does not render 40 C.F.R. § 56.5 "meaningless," *see* Br. 33, because regional offices could not simply unilaterally declare their policies to be national in scope. Even if 40 C.F.R. § 56.5(a)(1) applied to the present action, any failure to seek concurrence under 40 C.F.R. § 56.5(b) would have been harmless because, as a practical matter, EPA Region 3 obtained the concurrence of headquarters when

---

[27] This designation centralizes challenges in the D.C. Circuit and is distinct from whether regional action contravenes national policy. Here, EPA declined to find that the Final Rule had nationwide scope and effect, RTC_25-26, JA____-____, so challenges to the New Policy will be in regional circuits.

they developed and announced the Policy and promulgated the Agency's approval of West Virginia's plan together. The action also does not contravene 40 C.F.R. § 56.5(a)(2)'s directive to act as consistently as reasonably possible with other regions, as it is clearly consistent with a long list of subsequent regional actions to approve state plans using the Policy.[28]

Second, the Act's provisions governing the revision of any regulation related to visibility protection, *see* 42 U.S.C. § 7607(d)(1)(J), do not apply to EPA's action announcing the Policy because the Policy does not revise the Haze Rule. *Contra* Br. 34. As discussed in Section I.B, EPA's Policy is consistent with and did not revise existing regulations. *See supra* pages 35-39. In response to comments, EPA reiterated its "authority to promulgate [visibility] regulations," Br. 34 (quoting 90 Fed. Reg. at 29739), as statutory authority for its Policy; EPA did not thereby convert the Policy into a regulatory revision. Because EPA's Policy neither creates nor revises visibility regulations, it did not trigger Section 307(d)'s procedural requirements.

---

[28] EPA applied the New Policy in reviewing plans from Montana, Tennessee, Washington, Michigan, California, and other states. *See, e.g.,* RTC_20, JA____ (listing states); 91 Fed. Reg. 3057 (Jan. 26, 2026) (Indiana); 90 Fed. Reg. 57636 (Dec. 11, 2025) (South Carolina).

## IV. If the Court Holds for NPCA, the Appropriate Remedy Is Remand without Vacatur.

EPA's Final Rule is lawful and should be upheld. But even if the Court finds some error, vacatur would be inappropriate, especially as to the Policy. *Contra* Br. 56. Instead, the Court should remand to EPA while allowing the Final Rule to remain in place pending completion of remand proceedings.

Remand without vacatur is appropriate when "there is at least a realistic possibility that EPA will be able to substantiate the relevant designations on remand," and when vacating would be disruptive. *Clean Wis. v. EPA*, 964 F.3d 1145, 1177 (D.C. Cir. 2020) (citation modified).[29] Remand without vacatur is proper here both because the Final Rule could be sustained on remand with additional explanation, and because disruptive consequences might flow from vacatur.

First, as to EPA's approval of West Virginia's plan, NPCA primarily alleges record-based errors that EPA could readily address. If the Court found (and it should not) record-based deficiencies, EPA could cure them on remand.

---

[29] This court has previously applied but not formally adopted the D.C. Circuit standard. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018); *see also Md. Native Plant Soc'y v. U.S. Army Corps of Eng'rs*, 332 F. Supp. 2d 845, 862 (D. Md. 2004). *Cf. Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 837 n.6 (2024) (Kavanaugh, J., concurring).

Second, although NPCA challenges the Policy writ large, it has failed to demonstrate that the Policy would be illegal as applied to all plans, not just West Virginia's, or that EPA would be incapable of curing any deficiencies identified. *See NRDC v. EPA*, 571 F.3d 1245, 1258 (D.C. Cir. 2009). It is sufficient that the Policy might operate legally under some circumstances. *Flores*, 507 U.S. at 301. Vacatur could also impact EPA's actions on other state plan actions that rely on the Policy. At a minimum then, any vacatur should not run against the Policy.

## CONCLUSION

For the foregoing reasons, this Court should deny NPCA's petition.

Respectfully submitted,

/s/ Christine W. Ennis
Christine W. Ennis
Attorney
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 598-7342
christine.ennis@usdoj.gov

Of Counsel:

Kaytrue Ting
Office of General Counsel
U.S. Environmental Protection Agency
Washington, D.C.

Jacobine Dru
Region 3 – Office of Regional Counsel
U.S. Environmental Protection Agency
Philadelphia, PA

March 30, 2026
90-5-2-3-23068

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and the Court's order of December 19, 2025. By Microsoft Word's count, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,877 words, to which we have added 103 words, counted by hand, for the two figures reproduced herein. In total, this document contains 12,980 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document is in 14-point Times New Roman font, a proportionally spaced font.

/s/ Christine W. Ennis
CHRISTINE W. ENNIS

Counsel for Respondent

# STATUTORY AND REGULATORY ADDENDUM

## TABLE OF CONTENTS

42 U.S.C. § 7492 .......... ADD-001

40 C.F.R. § 52.2520(d) .......... ADD-004

40 C.F.R. § 56.1 .......... ADD-006

40 C.F.R. § 56.2 .......... ADD-006

40 C.F.R. § 56.3 .......... ADD-007

40 C.F.R. § 56.4 .......... ADD-007

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



cant impairment of visibility in any mandatory class I Federal area.

(2) Paragraph (1) of this subsection shall not be applicable to any fossil-fuel fired powerplant with total design capacity of 750 megawatts or more, unless the owner or operator of any such plant demonstrates to the satisfaction of the Administrator that such powerplant is located at such distance from all areas listed by the Administrator under subsection (a)(2) that such powerplant does not or will not, by itself or in combination with other sources, emit any air pollutant which may reasonably be anticipated to cause or contribute to significant impairment of visibility in any such area.

(3) An exemption under this subsection shall be effective only upon concurrence by the appropriate Federal land manager or managers with the Administrator's determination under this subsection.

**(d) Consultations with appropriate Federal land managers**

Before holding the public hearing on the proposed revision of an applicable implementation plan to meet the requirements of this section, the State (or the Administrator, in the case of a plan promulgated under section 7410(c) of this title) shall consult in person with the appropriate Federal land manager or managers and shall include a summary of the conclusions and recommendations of the Federal land managers in the notice to the public.

**(e) Buffer zones**

In promulgating regulations under this section, the Administrator shall not require the use of any automatic or uniform buffer zone or zones.

**(f) Nondiscretionary duty**

For purposes of section 7604(a)(2) of this title, the meeting of the national goal specified in subsection (a)(1) by any specific date or dates shall not be considered a ''nondiscretionary duty'' of the Administrator.

**(g) Definitions**

For the purpose of this section—

(1) in determining reasonable progress there shall be taken into consideration the costs of compliance, the time necessary for compliance, and the energy and nonair quality environmental impacts of compliance, and the remaining useful life of any existing source subject to such requirements;

(2) in determining best available retrofit technology the State (or the Administrator in determining emission limitations which reflect such technology) shall take into consideration the costs of compliance, the energy and nonair quality environmental impacts of compliance, any existing pollution control technology in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology;

(3) the term ''manmade air pollution'' means air pollution which results directly or indirectly from human activities;

(4) the term ''as expeditiously as practicable'' means as expeditiously as practicable but in no event later than five years after the date of approval of a plan revision under this section (or the date of promulgation of such a plan revision in the case of action by the Administrator under section 7410(c) of this title for purposes of this section);

(5) the term ''mandatory class I Federal areas'' means Federal areas which may not be designated as other than class I under this part;

(6) the terms ''visibility impairment'' and ''impairment of visibility'' shall include reduction in visual range and atmospheric discoloration; and

(7) the term ''major stationary source'' means the following types of stationary sources with the potential to emit 250 tons or more of any pollutant: fossil-fuel fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production facilities, chemical process plants, fossil-fuel boilers of more than 250 million British thermal units per hour heat input, petroleum storage and transfer facilities with a capacity exceeding 300,000 barrels, taconite ore processing facilities, glass fiber processing plants, charcoal production facilities.

(July 14, 1955, ch. 360, title I, §169A, as added Pub. L. 95–95, title I, §128, Aug. 7, 1977, 91 Stat. 742.)

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Subpart effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7492. Visibility

**(a) Studies**

(1) The Administrator, in conjunction with the National Park Service and other appropriate Federal agencies, shall conduct research to identify and evaluate sources and source regions of both visibility impairment and regions that provide predominantly clean air in class I areas. A total of $8,000,000 per year for 5 years is authorized to be appropriated for the Environmental Protection Agency and the other Federal agencies to conduct this research. The research shall include—

(A) expansion of current visibility related monitoring in class I areas;

(B) assessment of current sources of visibility impairing pollution and clean air corridors;

(C) adaptation of regional air quality models for the assessment of visibility;

(D) studies of atmospheric chemistry and physics of visibility.

(2) Based on the findings available from the research required in subsection (a)(1) as well as other available scientific and technical data, studies, and other available information pertaining to visibility source-receptor relationships, the Administrator shall conduct an assessment and evaluation that identifies, to the extent possible, sources and source regions of visibility impairment including natural sources as well as source regions of clear air for class I areas. The Administrator shall produce interim findings from this study within 3 years after November 15, 1990.

**(b) Impacts of other provisions**

Within 24 months after November 15, 1990, the Administrator shall conduct an assessment of the progress and improvements in visibility in class I areas that are likely to result from the implementation of the provisions of the Clean Air Act Amendments of 1990 other than the provisions of this section. Every 5 years thereafter the Administrator shall conduct an assessment of actual progress and improvement in visibility in class I areas. The Administrator shall prepare a written report on each assessment and transmit copies of these reports to the appropriate committees of Congress.

**(c) Establishment of visibility transport regions and commissions**

**(1) Authority to establish visibility transport regions**

Whenever, upon the Administrator's motion or by petition from the Governors of at least two affected States, the Administrator has reason to believe that the current or projected interstate transport of air pollutants from one or more States contributes significantly to visibility impairment in class I areas located in the affected States, the Administrator may establish a transport region for such pollutants that includes such States. The Administrator, upon the Administrator's own motion or upon petition from the Governor of any affected State, or upon the recommendations of a transport commission established under subsection (b) of this section[1] may—

(A) add any State or portion of a State to a visibility transport region when the Administrator determines that the interstate transport of air pollutants from such State significantly contributes to visibility impairment in a class I area located within the transport region, or

(B) remove any State or portion of a State from the region whenever the Administrator has reason to believe that the control of emissions in that State or portion of the State pursuant to this section will not significantly contribute to the protection or enhancement of visibility in any class I area in the region.

[1] So in original. Words ''subsection (b) of this section'' probably should be ''paragraph (2)''.

**(2) Visibility transport commissions**

Whenever the Administrator establishes a transport region under subsection (c)(1), the Administrator shall establish a transport commission comprised of (as a minimum) each of the following members:

(A) the Governor of each State in the Visibility Transport Region, or the Governor's designee;

(B) The[2] Administrator or the Administrator's designee; and

(C) A[2] representative of each Federal agency charged with the direct management of each class I area or areas within the Visibility Transport Region.

**(3) Ex officio members**

All representatives of the Federal Government shall be ex officio members.

**(4) Chapter 10 of title 5**

The visibility transport commissions shall be exempt from the requirements of chapter 10 of title 5.

**(d) Duties of visibility transport commissions**

A Visibility Transport Commission—

(1) shall assess the scientific and technical data, studies, and other currently available information, including studies conducted pursuant to subsection (a)(1), pertaining to adverse impacts on visibility from potential or projected growth in emissions from sources located in the Visibility Transport Region; and

(2) shall, within 4 years of establishment, issue a report to the Administrator recommending what measures, if any, should be taken under this chapter to remedy such adverse impacts. The report required by this subsection shall address at least the following measures:

(A) the establishment of clean air corridors, in which additional restrictions on increases in emissions may be appropriate to protect visibility in affected class I areas;

(B) the imposition of the requirements of part D of this subchapter affecting the construction of new major stationary sources or major modifications to existing sources in such clean air corridors specifically including the alternative siting analysis provisions of section 7503(a)(5) of this title; and

(C) the promulgation of regulations under section 7491 of this title to address long range strategies for addressing regional haze which impairs visibility in affected class I areas.

**(e) Duties of Administrator**

(1) The Administrator shall, taking into account the studies pursuant to subsection (a)(1) and the reports pursuant to subsection (d)(2) and any other relevant information, within eighteen months of receipt of the report referred to in subsection (d)(2) of this section, carry out the Administrator's regulatory responsibilities under section 7491 of this title, including criteria for measuring ''reasonable progress'' toward the national goal.

(2) Any regulations promulgated under section 7491 of this title pursuant to this subsection

[2] So in original. Probably should not be capitalized.

shall require affected States to revise within 12 months their implementation plans under section 7410 of this title to contain such emission limits, schedules of compliance, and other measures as may be necessary to carry out regulations promulgated pursuant to this subsection.

**(f) Grand Canyon visibility transport commission**

The Administrator pursuant to subsection (c)(1) shall, within 12 months, establish a visibility transport commission for the region affecting the visibility of the Grand Canyon National Park.

(July 14, 1955, ch. 360, title I, § 169B, as added Pub. L. 101–549, title VIII, § 816, Nov. 15, 1990, 104 Stat. 2695; amended Pub. L. 117–286, § 4(a)(269), Dec. 27, 2022, 136 Stat. 4335.)

**Editorial Notes**

REFERENCES IN TEXT

The Clean Air Act Amendments of 1990, referred to in subsec. (b), probably means Pub. L. 101–549, Nov. 15, 1990, 104 Stat. 2399. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of this title and Tables.

AMENDMENTS

2022—Subsec. (c)(4). Pub. L. 117–286 substituted ''chapter 10 of title 5.'' for ''the Federal Advisory Committee Act.''

PART D—PLAN REQUIREMENTS FOR NONATTAINMENT AREAS

SUBPART 1—NONATTAINMENT AREAS IN GENERAL

### § 7501. Definitions

For the purpose of this part—

(1) REASONABLE FURTHER PROGRESS.—The term ''reasonable further progress'' means such annual incremental reductions in emissions of the relevant air pollutant as are required by this part or may reasonably be required by the Administrator for the purpose of ensuring attainment of the applicable national ambient air quality standard by the applicable date.

(2) NONATTAINMENT AREA.—The term ''nonattainment area'' means, for any air pollutant, an area which is designated ''nonattainment'' with respect to that pollutant within the meaning of section 7407(d) of this title.

(3) The term ''lowest achievable emission rate'' means for any source, that rate of emissions which reflects—

(A) the most stringent emission limitation which is contained in the implementation plan of any State for such class or category of source, unless the owner or operator of the proposed source demonstrates that such limitations are not achievable, or

(B) the most stringent emission limitation which is achieved in practice by such class or category of source, whichever is more stringent.

In no event shall the application of this term permit a proposed new or modified source to emit any pollutant in excess of the amount allowable under applicable new source standards of performance.

(4) The terms ''modifications'' and ''modified'' mean the same as the term ''modification'' as used in section 7411(a)(4) of this title.

(July 14, 1955, ch. 360, title I, § 171, as added Pub. L. 95–95, title I, § 129(b), Aug. 7, 1977, 91 Stat. 745; amended Pub. L. 101–549, title I, § 102(a)(2), Nov. 15, 1990, 104 Stat. 2412.)

**Editorial Notes**

AMENDMENTS

1990—Pub. L. 101–549, § 102(a)(2)(A), struck out ''and section 7410(a)(2)(I) of this title'' after ''purpose of this part''.

Pars. (1), (2). Pub. L. 101–549, § 102(a)(2)(B), (C), amended pars. (1) and (2) generally. Prior to amendment, pars. (1) and (2) read as follows:

''(1) The term 'reasonable further progress' means annual incremental reductions in emissions of the applicable air pollutant (including substantial reductions in the early years following approval or promulgation of plan provisions under this part and section 7410(a)(2)(I) of this title and regular reductions thereafter) which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 7502(a) of this title.

''(2) The term 'nonattainment area' means, for any air pollutant an area which is shown by monitored data or which is calculated by air quality modeling (or other methods determined by the Administrator to be reliable) to exceed any national ambient air quality standard for such pollutant. Such term includes any area identified under subparagraphs (A) through (C) of section 7407(d)(1) of this title.''

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Part effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### § 7502. Nonattainment plan provisions in general

**(a) Classifications and attainment dates**

**(1) Classifications**

(A) On or after the date the Administrator promulgates the designation of an area as a nonattainment area pursuant to section 7407(d) of this title with respect to any national ambient air quality standard (or any revised standard, including a revision of any standard in effect on November 15, 1990), the Administrator may classify the area for the purpose of applying an attainment date pursuant to paragraph (2), and for other purposes. In determining the appropriate classification, if any, for a nonattainment area, the Administrator may consider such factors as the severity of nonattainment in such area and the availability and feasibility of the pollution control measures that the Administrator believes may be necessary to provide for attainment of such standard in such area.

(B) The Administrator shall publish a notice in the Federal Register announcing each classification under subparagraph (A), except the Administrator shall provide an opportunity for at least 30 days for written comment. Such classification shall not be subject to the provisions of sections 553 through 557 of title 5 (concerning notice and comment) and shall not be

EPA-APPROVED REGULATIONS IN THE WEST VIRGINIA SIP—Continued

| State citation [Chapter 16–20 or 45 CSR] | Title/subject | State effective date | EPA approval date | Additional explanation/ citation at 40 CFR 52.2565 |
|---|---|---|---|---|
| Section 45–40–3 | Measurements, Abbreviations and Acronyms. | 7/1/16 | 12/4/2018, 83 FR 62473. | Removed definitions for Hg, kW, kWh, $MW_w$, MWh, $O_2$, ppm, lb, scfh, $SO_2$, and $H_2O$. Prior approval of this section was 74 FR 38536 on 8/4/09. |
| Section 45–40–4 | Applicability | 7/1/16 | 12/4/2018, 83 FR 62473. | Remove preamble, 4.1, 4.2, 4.3, 4.4, and 4.5. Add new 4.1, 4.2, and 4.3. Prior approval of this section was 74 FR 38536 on 8/4/09. |
| Section 45–40–5 | Ozone Season $NO_X$ Emission Limitations. | 7/1/16 | 12/4/2018, 83 FR 62473. | Prior approval of this section was 74 FR 38536 on 8/4/09. |
| Section 45–40–6 | Monitoring, Recordkeeping and Reporting Requirements. | 7/1/16 | 12/4/2018,83 FR 62473. | Prior approval of this section was 74 FR 38536 on 8/4/09. |
| Section 45–40–7 | Violation | 7/1/16 | 12/4/2018, 83 FR 62473. | Prior approval of this section was 74 FR 38536 on 8/4/09. |
| Section 45–40–8 | Ozone Season $NO_X$ Budget Demonstration. | 7/1/16 | 12/4/2018, 83 F R 62473. | Prior approval of this section was 74 FR 38536 on 8/4/09. |
| Section 45–40–9 | Ozone Season $NO_X$ Reduction Requirements for Stationary Internal Combustion Engines. | 7/1/16 | 12/4/2018, 83 FR 62473. | Prior approval of this section was 74 FR 38536 on 8/4/09. |
| Section 45–40–10 | Ozone Season $NO_X$ Reduction Requirements for Emissions of $NO_X$ from Cement Manufacturing Kilns. | 7/1/16 | 12/4/2018, 83 FR 62473. | Prior approval of this section was 74 FR 38536 on 8/4/09. |
| Section 45–40–11 | Inconsistency Between Rules | 7/1/16 | 12/4/2018, 83 FR 62473. | Prior approval of this section was 74 FR 38536 on 8/4/09. |

EPA-APPROVED REGULATIONS AND STATUTES

| State citation | Title/subject | State effective date | EPA approval date | Explanation [former SIP citation] |
|---|---|---|---|---|
| **West Virginia Code 6B—Ethics Standards and Financial Disclosure** | | | | |
| 6B–1–3 | Definitions | 10/1/2014 | 3/9/2015, 80 FR 12348 | Addresses CAA section 128. |
| 6B–2–6 | Financial disclosure statement; filing requirements. | 10/1/2014 | 3/9/2015, 80 FR 12348 | Addresses CAA section 128. |
| 6B–2–7 | Financial disclosure statement; contents. | 10/1/2014 | 3/9/2015, 12348 | Addresses CAA section 128. |

(d) *EPA approved state source-specific requirements.*

EPA-APPROVED SOURCE SPECIFIC REQUIREMENTS

| Source name | Permit/order or registration number | State effective date | EPA approval date | Additional explanation/ citation at 40 CFR 52.2565 |
|---|---|---|---|---|
| National Steel Corp.—Weirton Steel Division. | Consent Order (Bubble) ..... | 7/6/82 | 12/9/82 47 FR 55396. | (c)(19). |
| Columbia Gas Transmission Corporation—Lost River Station. | Consent Order ................... | 9/12/90 | 4/24/91 56 FR 18733. | (c)(24). |
| Wheeling-Pittsburgh Steel Corp .......... | Consent Order CO–SIP–91–29. | 11/14/91 | 7/25/94 59 FR 37696. | (c)(26). |
| Koppers Industries, Inc ....................... | Consent Order CO–SIP–91–32. | 11/14/91 | 7/25/94 59 FR 37696. | (c)(26). |
| Starvaggi Industries, Inc ...................... | Consent Order CO–SIP–91–34. | 11/14/91 | 7/25/94 59 FR 37696. | (c)(26). |
| Quaker State Corporation ................... | Consent Order CO–SIP–95–1. | 1/9/95 | 11/27/96 61 FR 60191. | (c)(35). |
| Weirton Steel Corporation ................... | Consent Order CO–SIP–95–2. | 1/9/95 | 11/27/96 61 FR 60191. | (c)(35). |
| PPG Industries, Inc ............................. | Consent Order CO–SIP–2000–1. | 1/25/00 | 8/2/00 65 FR 47339. | (c)(44)(i)(B)(*1*). |
| Bayer Corporation ............................... | Consent Order CO–SIP–2000–2. | 1/26/00 | 8/2/00 65 FR 47339. | (c)(44)(i)(B)(*2*). |
| PPG Industries, Inc ............................. | Consent Order CO–SIP–C–2003–27. | 7/29/03 | 4/28/04 69 FR 23110. | (c)(58). |
| Wheeling-Pittsburgh Steel Corporation | Operating Permit R13–1939A. | 8/19/03 | 05/05/04 69 FR 24986. | (c)(59)(i)(B)(*1*). |
| Weirton Steel Corporation ................... | Consent Order, CO–SIP–C–2003–28. | 8/4/03 | 05/05/04 69 FR 24986. | (c)(59)(i)(B)(*2*). |
| Mountain State Carbon ....................... | Consent Order CO–SIP–C–2017–9. | 9/29/17 | 10/22/2019, 84 FR 56388. | |
| Mitchell Power Plant ............................ | Consent Order CO–SIP–C–2019–13. | 01/01/2020 | 10/26/2020, 85 FR 67664. | Established $SO_2$ emission limit. |

(e) *EPA-approved nonregulatory and quasi-regulatory material.*

| Name of non-regulatory SIP revision | Applicable geographic area | State submittal date | EPA approval date | Additional explanation |
|---|---|---|---|---|
| PM–10 Attainment Plan .......... | Folansbee Area ............... | 11/15/91 | 7/25/94, 59 FR 37688 | 52.2522(f); renumbered as (d) at 60 FR 33925. |
| | | 11/22/95 | 11/15/96, 61 FR 58481 | 52.2522(g). |
| Sulfur Dioxide Attainment Demonstration. | City of Weirton Butler and Clay Magisterial Districts (Brooke & Hancock Counties). | 12/29/03 | 05/05/04, 69 FR 24986 | 52.2525(b). |
| 1990 Base Year Emissions Inventory-VOC, CO, $NO_X$. | Greenbrier County ........... | 12/22/92 | 8/4/95, 60 FR 39857 | 52.2531. |
| Small Business stationary source technical and environmental compliance assistance program. | Statewide ......................... | 1/13/93 | 9/15/93, 58 FR 48309 | 52.2560. |
| Lead (Pb) SIP ......................... | Statewide ......................... | 6/13/80 | 10/29/81, 46 FR 53413 | 52.2565(c)(15). |
| Air Quality Monitoring Network | Statewide ......................... | 11/4/83 | 4/27/84, 49 FR 18094 | 52.2565(c)(21). |
| Ozone Maintenance Plan, emissions inventory & contingency measures. | Huntington Area (Cabell & Wayne Counties). | 8/10/94 | 12/21/94, 59 FR 65719 | 52.2565(c)(30). |
| Ozone Maintenance Plan, emissions inventory & contingency measures. | Parkersburg Area (Wood County). | 8/10/94 | 9/6/94, 59 FR 45978 | 52.2565(c)(31). |
| Ozone Maintenance Plan, emissions inventory & contingency measures. | Charleston Area (Kanahwa & Putnam Counties). | 8/10/94 | 9/6/94, 59 FR 45985 | 52.2565(c)(32). |
| Sulfur Dioxide Plan ................. | Grant Magisterial District (Hancock County). | 2/17/95 | 11/27/96, 61 FR 60253 | 52.2565(c)(35). |
| Ozone Maintenance Plan & contingency measures. | Greenbrier County ........... | 9/9/94 | 8/4/95, 60 FR 39857 | 52.2565(c)(36). |

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO



9VAC5–130–40. Permissible open burning.

PART III—SPECIAL STATEWIDE REQUIREMENTS FOR FORESTRY, AGRICULTURAL AND HIGHWAY PROGRAMS

9VAC5–130–50. Forest management, agricultural practices and highway construction and maintenance programs.

*Chapter 151—Transportation Conformity*

(Effective 11/16/2016)

PART I—GENERAL DEFINITIONS

9VAC5–151–10. Definitions.

PART II—GENERAL PROVISIONS

9VAC5–151–20. Applicability.
9VAC5–151–30. Authority of board and DEQ.

PART III—CRITERIA AND PROCEDURES FOR MAKING CONFORMITY DETERMINATIONS

9VAC5–151–40. General.
9VAC5–151–50. Designated provisions.
9VAC5–151–60. Word or phrase substitutions.
9VAC5–151–70. Consultation.

*Chapter 160—General Conformity*

(Effective 05/15/2017)

PART I—GENERAL DEFINITIONS

9VAC5–160–10. General.
9VAC5–160–20. Terms defined.

PART II—GENERAL PROVISIONS

9VAC5–160–30. Applicability.
9VAC5–160–40. Authority of board and department.
9VAC5–160–80. Relationship of state regulations to Federal regulations.

PART III—CRITERIA AND PROCEDURES FOR MAKING CONFORMITY DETERMINATIONS

9VAC5–160–110. General.
9VAC5–160–120. Federal agency conformity analysis.
9VAC5–160–130. Reporting requirements.
9VAC5–160–140. Public participation.
9VAC5–160–150. Reevaluation of conformity.
9VAC5–160–160. Criteria for determining conformity of general Federal actions.
9VAC5–160–170. Procedures for conformity determinations.
9VAC5–160–180. Mitigation of air quality impacts.
9VAC5–160–190. Savings provision.

(2) [Reserved]

[57 FR 40806, Sept. 4, 1992]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting appendix A to part 55, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov*.

## PART 56—REGIONAL CONSISTENCY

Sec.
56.1 Definitions.
56.2 Scope.
56.3 Policy.
56.4 Mechanisms for fairness and uniformity—Responsibilities of Headquarters employees.
56.5 Mechanisms for fairness and uniformity—Responsibilities of Regional Office employees.
56.6 Dissemination of policy and guidance.
56.7 State agency performance audits.

AUTHORITY: Sec. 301(a)(2) of the Clean Air Act as amended (42 U.S.C. 7601).

SOURCE: 45 FR 85405, Dec. 24, 1980, unless otherwise noted.

### § 56.1 Definitions.

As used in this part, all terms not defined herein have the meaning given them in the Clean Air Act.

*Act* means the Clean Air Act as amended (42 U.S.C. 7401 *et seq.*).

*Administrator, Deputy Administrator, Assistant Administrator, General Counsel, Associate General Counsel, Deputy Assistant Administrator, Regional Administrator, Headquarters, Staff Office, Operational Office*, and *Regional Office* are described in part 1 of this title.

*Mechanism* means an administrative procedure, guideline, manual, or written statement.

*Program directive* means any formal written statement by the Administrator, the Deputy Administrator, the Assistant Administrator, a Staff Office Director, the General Counsel, a Deputy Assistant Administrator, an Associate General Counsel, or a division Director of an Operational Office that is intended to guide or direct Regional Offices in the implementation or enforcement of the provisions of the act.

*Responsible official* means the EPA Administrator or any EPA employee who is accountable to the Administrator for carrying out a power or duty delegated under section 301(a)(1) of the act, or is accountable in accordance with EPA's formal organization for a particular program or function as described in part 1 of this title.

### § 56.2 Scope.

This part covers actions taken by:

(a) Employees in EPA Regional Offices, including Regional Administrators, in carrying out powers and duties delegated by the Administrator under section 301(a)(1) of the act; and

(b) EPA employees in Headquarters to the extent that they are responsible for developing the procedures to be employed or policies to be followed by Regional Offices in implementing and enforcing the act.

### § 56.3 Policy.

It is EPA's policy to:

(a) Assure fair and uniform application by all Regional Offices of the criteria, procedures, and policies employed in implementing and enforcing the act;

(b) Provide mechanisms for identifying and correcting inconsistencies by standardizing criteria, procedures, and policies being employed by Regional Office employees in implementing and enforcing the act; and

(c) Insure an adequate quality audit for each State's performance in implementing and enforcing the act.

(d) Recognize that only the decisions of the U.S. Supreme Court and decisions of the U.S. Court of Appeals for the D.C. Circuit Court that arise from challenges to ''nationally applicable regulations . . . or final action,'' as discussed in Clean Air Act section 307(b) (42 U.S.C. 7607(b)), shall apply uniformly, and to provide for exceptions to the general policy stated in paragraphs (a) and (b) of this section with regard to decisions of the federal courts that arise from challenges to ''locally or regionally applicable'' actions, as provided in Clean Air Act section 307(b) (42 U.S.C. 7607(b)).

[45 FR 85405, Dec. 24, 1980, as amended at 81 FR 51113, Aug. 3, 2016]

### § 56.4 Mechanisms for fairness and uniformity—Responsibilities of Headquarters employees.

(a) The Administrator shall include, as necessary, with any rule or regulation proposed or promulgated under parts 51 and 58 of this chapter[1] mechanisms to assure that the rule or regulation is implemented and enforced fairly and uniformly by the Regional Offices.

(b) The determination that a mechanism required under paragraph (a) of this section is unnecessary for a rule or regulation shall be explained in writing by the responsible EPA official and included in the supporting documentation or the relevant docket.

(c) The Administrator shall not be required to issue new mechanisms or revise existing mechanisms developed under paragraphs (a) of this section to address the inconsistent application of any rule, regulation, or policy that may arise in response to the limited jurisdiction of either a federal circuit court decision arising from challenges to ''locally or regionally applicable'' actions, as provided in Clean Air Act section 307(b) (42 U.S.C. 7607(b)), or a federal district court decision.

[45 FR 85405, Dec. 24, 1980, as amended at 81 FR 51113, Aug. 3, 2016]

### § 56.5 Mechanisms for fairness and uniformity—Responsibilities of Regional Office employees.

(a) Each responsible official in a Regional Office, including the Regional Administrator, shall assure that actions taken under the act:

(1) Are carried out fairly and in a manner that is consistent with the Act and Agency policy as set forth in the Agency rules and program directives,

(2) Are as consistent as reasonably possible with the activities of other Regional Offices, and

(3) Comply with the mechanisms developed under §56.4 of this part.

(b) A responsible official in a Regional office shall seek concurrence from the appropriate EPA Headquarters office on any interpretation of the Act, or rule, regulation, or program directive when such interpretation may result in application of the act or rule, regulation, or program directive that is inconsistent with Agency policy. However, the responsible official in a Regional office will not be required to seek such concurrence from the appropriate EPA Headquarters office for actions that may result in inconsistent application if such inconsistent application is required in order to act in accordance with a federal court decision:

[1] Part 51 is entitled, ''Requirements for Preparation, Adoption, and Submittal of Implementation Plans.'' Part 58 is entitled, ''Ambient Air Quality Surveillance.''

(1) Issued by a Circuit Court in challenges to ''locally or regionally applicable'' actions, as provided in Clean Air Act section 307(b) (42 U.S.C. 7607(b)), if that circuit court has direct jurisdiction over the geographic areas that the Regional office official is addressing, or (2) Issued by a district court in a specific case if the party the Regional office official is addressing was also a party in the case that resulted in the decision.

(c) In reviewing State Implementation Plans, the Regional Office shall follow the provisions of the guideline, revisions to State Implementation Plans—Procedures for Approval/Disapproval Actions, OAQPS No. 1.2–005A, or revision thereof. Where regulatory actions may involve inconsistent application of the requirements of the act, the Regional Offices shall classify such actions as special actions.

[45 FR 85405, Dec. 24, 1980, as amended at 81 FR 51114, Aug. 3, 2016]

**§ 56.6 Dissemination of policy and guidance.**

The Assistant Administrators of the Offices of Air, Noise and Radiation, and of Enforcement, and the General Counsel shall establish as expeditiously as practicable, but no later than one year after promulgation of this part, systems to disseminate policy and guidance. They shall distribute material under foregoing systems to the Regional Offices and State and local agencies, and shall make the material available to the public. Air programs policy and guideline systems shall contain the following:

(a) Compilations of relevant EPA program directives and guidance, except for rules and regulations, concerning the requirements under the Act.

(b) Procedures whereby each Headquarters program office and staff office will enter new and revised guidance into the compilations and cause superseded guidance to be removed.

(c) Additional guidance aids such as videotape presentations, workshops, manuals, or combinations of these where the responsible Headquarters official determines they are necessary to inform Regional Offices, State and local agencies, or the public about EPA actions.

**§ 56.7 State agency performance audits.**

(a) EPA will utilize the provisions of subpart B, Program Grants, of part 35 of this chapter, which require yearly evaluations of the manner in which grantees use Federal monies, to assure that an adequate evaluation of each State's performance in implementing and enforcing the act is performed.

(b) Within 60 days after comment is due from each State grantee on the evaluation report required by § 35.538 of this chapter, the Regional Administrator shall incorporate or include any comments, as appropriate, and publish notice of availability of the evaluation report in the FEDERAL REGISTER.

## PART 57—PRIMARY NONFERROUS SMELTER ORDERS

### Subpart A—General

Sec.

57.101 Purpose and scope.
57.102 Eligibility.
57.103 Definitions.
57.104 Amendment of the NSO.
57.105 Submittal of required plans, proposals, and reports.
57.106 Expiration date.
57.107 The State or local agency's transmittal to EPA.
57.108 Comparable existing SIP provisions.
57.109 Maintenance of pay.
57.110 Reimbursement of State or local agency.
57.111 Severability of provisions.

### Subpart B—The Application and the NSO Process

57.201 Where to apply.
57.202 How to apply.
57.203 Contents of the application.
57.204 EPA action on second period NSOs which have already been issued.
57.205 Submission of supplementary information upon relaxation of an $SO_2$ SIP emission limitation.

### Subpart C—Constant Controls and Related Requirements

57.301 General requirements.
57.302 Performance level of interim constant controls.
57.303 Total plantwide emission limitation.
57.304 Bypass, excess emissions and malfunctions.